**DEPARTMENT OF WATER AND POWER OF the CITY OF LOS ANGELES, Petitioner,**

v.

**BONNEVILLE POWER ADMINISTRATION, Respondent.**

No. 84–7618.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 16, 1985.

Decided April 24, 1985.

Henry C. Thuman, O'Melveny & Myers, Los Angeles, Cal., for petitioner.

R. John Seibert, Dennis G. Linder, Portland, Or., for respondent.

Before KILKENNY, GOODWIN and SKOPIL, Circuit Judges.

GOODWIN, Circuit Judge.

The Department of Water and Power of the City of Los Angeles brings a direct appeal[1] challenging a policy implemented by the Administrator of the Bonneville Power Administration [BPA] which allocates use of electricity transmission lines connecting the Pacific Northwest with California. Reviewing the regulation in light of the broad range of powers statutorily granted to the Administrator, we uphold the validity of the regulation.

This case asks whether, to what extent and for what reasons, BPA can exercise control over the marketing of electricity generated in the Pacific Northwest. Like many similar cases, this one involves a complex web of four federal statutes and a complex factual background.[2] The real issue here is whether the City of Los Angeles can purchase low-cost electricity from vendors in Canada and transmit that electricity at rates favorable to Los Angeles

---

1. The Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839–839h, makes this court a court of original jurisdiction for suits challenging BPA administrative actions. 16 U.S.C. § 839f(e)(5). Any "final actions and decisions ... or the implementation of such final actions" taken pursuant to any of the four enabling statutes are subject to direct review by the Ninth Circuit. *See Forelaws on Board v. Johnson,* 743 F.2d 677, 679 (9th Cir. 1985); *Central Lincoln Peoples' Utility District v. Johnson,* 735 F.2d 1101, 1108 (9th Cir.1984).

2. The four federal statutes provide the statutory authority for electricity generation, regulation and marketing of electricity in the Pacific Northwest and for the marketing of Northwest electricity in the Pacific Southwest. Those statutes are the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839–839h ["Northwest Power Act"], the Federal Columbia River Transmission System Act, 16 U.S.C. §§ 838–838k. ["Columbia River Act"], the Pacific Northwest Power Preference Act, 16 U.S.C. §§ 837–837h ["Preference Act"], and the Bonneville Project Act, 16 U.S.C. §§ 832–832*l*. ["Project Act"].

contrary to the pricing strategy of the Administrator.

The City of Los Angeles provides electricity to customers in and near Los Angeles. Bonneville Power Administration is a federal agency within the Department of Energy organized for three purposes: to produce electric power at the Bonneville Dam on the Columbia River, to market power produced from numerous dams on the Columbia River as part of the Federal Columbia River Power System, and to supervise distribution of power within and from the Pacific Northwest. BPA itself is subject to regulatory supervision by the Federal Energy Regulatory Commission. 16 U.S.C. §§ 839e(i)(6), 839e(k).

Producers of electricity in the Pacific Northwest are linked to producers and consumers of electricity in the Pacific Southwest through the Pacific Northwest-Pacific Southwest Intertie, a system of three high-voltage transmission lines.[3] BPA owns and operates almost all of the lines north of the Oregon-California and Oregon-Nevada borders. South of Oregon, the lines are owned by a number of California utilities. The City owns 40 per cent of one of those lines.

The purpose of the Intertie, established by Congress in the late 1960's, see Pub.L. No. 88–257, 77 Stat. 844 (1964); Pub.L. No. 88–511, 78 Stat. 682 (1965) (appropriations for construction of the Intertie), is to even out the peaks and troughs in the production and consumption of power between the Northwest and the Southwest. At certain times of year the Northwest produces more electricity than it can use and the Southwest experiences particularly heavy electricity consumption. At other times, the Northwest has heavy demand and the Southwest can produce surplus power. By allowing electricity to flow either north or south, each region can assist the other during times of heavy demand.[4]

BPA produces approximately half the hydroelectric power sold in the Pacific Northwest. The remainder is produced by 15 publicly-owned or investor-owned utilities. BPA and the other utilities store the generation capacity of hydroelectric energy as water, held behind dams with finite storage capacities. This means that the generation capacity is perishable, because limits to storage and replenishment depend upon reservoir capacity and river flows. As a result, a major responsibility of BPA is the management of water levels consistent with seasonal water flows and electricity demands.

The water management process is complicated because the seasonal periods of high and low river flow do not necessarily correspond to seasons of high and low electricity demand. In marketing hydroelectric energy, BPA must distinguish between power which can be generated during periods of the lowest river flow and power which can be generated only during peak river flow. A distinction has arisen, therefore, between so-called firm power (which is always available) and so-called nonfirm or interruptible power (which is available only during peak river flows). *See ALCOA v. Central Lincoln Peoples' Util. Dist.*,

---

**3.** Although the Intertie was designed to link the Northwest with the entire Southwest, the system is being used largely by Northwest and California utilities. A new Intertie connection between the Northwest and Arizona is planned. *See* BPA, *Columbia River Power for the People: A History of Policies of the Bonneville Power Administration* 237–46 (1981).

**4.** It is useful to think of the Intertie as a pipeline in which electricity flows. The electricity can flow in either direction: from Pacific Northwest producers to California consumers or from California producers to Northwest consumers. Like a pipe, the Intertie has a finite capacity for transmitting electricity flows. In recent years, the flow in the Intertie has been almost entirely from the Northwest to California. Heavy river volume and lower than projected electricity demand in the Northwest have resulted in consistent surpluses of Northwest electricity. Furthermore, the cost of Northwest hydroelectric power (the source of most Northwest electricity) historically has been less than the cost of thermal power produced in California, making it financially attractive for California utilities to purchase as much Northwest electricity as the Intertie can hold. *See generally* D.W. Meek, *Pacific Northwest Conservation for California: The Mutual Benefits of Long Term Cooperation,* 13 Environmental Law 841 (1983).

— U.S. ——, 104 S.Ct. 2472, 2475, 81 L.Ed.2d 301 (1984).

Over the years, BPA has entered into numerous contracts for the sale of firm power, both within the Northwest and outside the region. BPA has had such a contract with the City. The City also buys nonfirm hydroelectric power from BPA from time to time as it is available and as the City has demand for it. During times of electricity shortage, parties to firm power contracts receive priority over any nonfirm energy purchasers. *See e.g.* 16 U.S.C. § 837f; *ALCOA,* 104 S.Ct. at 2477–79.

In the sale of both firm and nonfirm power, BPA is statutorily required to give priority to purchasers within the Northwest, 16 U.S.C. § 837a, and to public bodies and cooperatives, 16 U.S.C. § 832c(a). Sale to utilities outside the region is limited to electricity "which would otherwise be wasted because of the lack of a market therefor in the Pacific Northwest at any established rate." 16 U.S.C. §§ 837(c), 837(d). This electricity is known as surplus power.

Sale of any power by a Northwest utility to a California utility, such as the City, requires the transmission of that power to the California purchaser. The Intertie transmits this energy. But, because there are many purchasers of power and because seasonal availability may affect the amount of power which utilities wish to transmit over the Intertie to California purchasers, BPA must allocate Intertie capacity among both purchasers and producers.

In allocating Intertie capacity among itself and other Northwest electricity producers, BPA is statutorily required to give itself preference. 16 U.S.C. § 837e. Any capacity in the Intertie "which is not required for the transmission of Federal energy ... shall be made available as a carrier for transmission of other electric energy...." *Id.*

When Northwest utilities must generate more electricity than they can possibly use in the Northwest (to avoid the wasteful spilling of water over their dams), the electricity so generated is sometimes not only too much to be used in the Northwest but also exceeds the capacity of the Intertie to transmit.

To allocate Intertie capacity for surplus power sales outside the region, BPA has entered into an agreement with Northwest utilities known as the Exportable Agreement.[5] The Exportable Agreement allocates Intertie capacity among competing producers during times of potential spillover by permitting each Northwest utility to sell a pro rata portion of its surplus power to California purchasers and to transmit that power over the Intertie until Intertie capacity has been reached. When the Exportable Agreement triggers an allocation of scarce Intertie capacity, nonregional producers (*i.e.,* electricity producers in Canada) are precluded from using the Intertie. That agreement was, until the policy which is the subject of this litigation, the only means for allocating Intertie capacity.

In the past, when river flows did not threaten a spillover condition, BPA did not regulate Interie access. Instead, BPA allowed access to the Intertie (up to its maximum capacity) to both Northwest and Canadian utilities. Market forces determined how much energy each Northwest or Canadian utility could sell to purchasers in California. If Canadian utilities offered the most attractive price to California purchasers, for example, those utilities were permitted to use potentially all Intertie capacity, at the exclusion of Northwest utilities which were offering less attractive prices. Canadian producers as a group have been the second largest user of Intertie capacity, after BPA itself.

There are several different ways by which California utilities purchase Northwest power. The first, known as a bilateral purchase, is a spot-market purchase of electricity. After the seller and purchaser

---

**5.** Agreement Executed by the United States of America Department of the Interior by and through the Bonneville Power Administrator and Utilities in the Pacific Northwest (BPA Contract No. 14–03–73155, January 13, 1969).

agree upon a price, quantity and duration, the energy is "wheeled" over the Intertie directly from the producer to the purchaser.[6] Wheeling agreements provide a significant percentage of the energy needs of some California utilities including the City.[7]

The second major power sale arrangement is the exchange agreement. An exchange agreement is a reservation by a purchaser to borrow electricity which is later returned to the producer. A purchaser reserves capacity on the Intertie to accommodate the electricity it needs to borrow (usually for peak daily usage), and reserves capacity to return the same amount of electricity at a later time (often the same day) when its own generation capacity is not being fully used. Because this energy transaction is used to accommodate peak electricity demands, the arrangement is known as a peaking return exchange agreement. The energy so transmitted is known as obligation energy. Because the Intertie can be used for transmitting electricity either to the north or to the south, the Intertie can be used for both ends of the transaction: the borrowing of electricity during peak times by California utilities and the return of electricity to Northwest utilities during California's off-peak hours.

The City and BPA have had a long-standing exchange agreement. Because market conditions in recent years have made Canadian power very attractive, however, the City has been satisfying its obligation to return borrowed energy by purchasing electricity from British Columbia Hydro Authority and having that electricity returned to BPA at the British Columbia—Washington border. Consequently, the Intertie has been used by the City to borrow BPA power but not to return the obligation energy. BPA and the City have an ongoing dispute over whether this arrangement is permissible under their exchange agreement.[8] BPA has demanded that the City return obligation energy at the same location where it borrows it: the Oregon—Nevada border. If the City did return borrowed electricity in the manner demanded by BPA, Intertie capacity would be needed for both borrowed and return obligation energy meaning that less power could be transmitted from north to south on the Intertie.

## BPA INTERTIE ACCESS POLICY: THIS DISPUTE

BPA is facing a potentially significant revenue shortfall in coming years which may jeopardize its ability to recover costs as is required by the Columbia River Act. *See* 16 U.S.C. § 838g(3). It is this threat which BPA cites as a primary reason for the policy which is the subject of this litigation. The agency offers two explanations for this unanticipated revenue shortfall. First is a lower-than-expected demand for firm power from those industrial customers who purchase huge quantities of electricity directly from BPA. Many of these customers are large aluminum producers which have been affected by a depressed aluminum market. *Cf. ALCOA*, 104 S.Ct. at

---

**6.** Wheeling is the procedure by which the owner of transmission lines transmits electricity produced by another party for a specified charge. *See* M.C. Blumm, *The Northwest's Hydroelectric Heritage: Prologue to the Pacific Northwest Electric Power Planning and Conservation Act,* 58 Wash.L.Rev. 175, 212–13 (1982). While the statutory authority for BPA wheeling originally was doubtful, wheeling has long been a BPA practice. *See* BPA, *Columbia River Power for the People: A History of Policies of the Bonneville Power Administration* 201–07 (1981); Columbia River Act, 16 U.S.C. § 838d.

**7.** Such agreements help California utility entities avoid the cost of building expensive generat-

ing plants to accommodate demand which arises only during peak daily usage. Of course, Northwest utilities also benefit from the sale of electricity which might otherwise be wasted. *See generally* D.W. Meek, 13 Environmental Law 841.

**8.** The City has sued the federal government over the BPA interpretation of the exchange agreement. *Department of Water & Power of the City of Los Angeles v. United States,* No. 181–84C (U.S.Ct.Cl. pending). Each party has claimed the other to be in material breach of the exchange agreement.

2478. Secondly, BPA has sold less than predicted amounts of surplus power to extraregional utilities. In part because of lower prices offered by Canadian vendors to California customers (including the City), the market has shrunk for BPA surplus power. *See Calif. Energy Resources Cons. and Develop. Comm'n v. BPA*, 754 F.2d 1470, 1472 (9th Cir.1985); *Portland Gen. Elec. Co. v. Johnson*, 754 F.2d 1475, 1477–78 (9th Cir.1985).

On September 7, 1984, BPA promulgated its Near Term Intertie Access Policy [IAP]. 49 *Fed.Reg.* 44,232–38 (November 5, 1984). The policy was adopted after a series of public hearings and *Federal Register* notices. 48 *Fed.Reg.* 33,515 (July 22, 1983) (notice of intent to develop policy on Intertie access); 49 *Fed.Reg.* 5,990 (Feb. 16, 1984) (comments on notice of intent); 49 *Fed.Reg.* 30,098 (July 13, 1984) (proposed Intertie Access Policy). *See generally* Near Term Intertie Access Policy: Administrator's Record of Decision (September 7, 1984). The policy is to remain in effect until May 1, 1985, at which time the agency will decide on a Long Term Intertie Policy. 50 *Fed.Reg.* 6,379 (Feb. 15, 1985) (extending expiration date from March 1 to May 1, 1985).

While the IAP sets out three different allocation formulae for different market and electricity supply conditions, several assumptions underlie all three formulae. Priority in access to the Intertie is always afforded to Northwest electricity suppliers selling firm power to California purchasers. IAP ¶ D.1, 49 *Fed.Reg.* at 44236. The IAP assures delivery of power for existing firm power contracts, IAP ¶ D.1.a., and allows those Northwest utilities capable of doing

so to enter into additional firm power contracts with California utilities. IAP ¶ D.1.b. Among those contracts which will be afforded assured delivery are exchange agreements including that between BPA and the City. Only after firm power contracts· are satisfied will BPA allocate Intertie access for movement of nonfirm power. IAP ¶ D.2. Canadian utilities can never use the Intertie to transmit firm power. IAP ¶ E.

Once firm power contracts are satisfied, formulae for allocation of Intertie capacity for nonfirm energy depend upon supply and demand under three different conditions.

Condition 1 applies when there is a surplus of Northwest electricity and Northwest utilities are willing to sell electricity to California purchasers at a BPA-established rate. This portion of the IAP does not change existing BPA policy; it incorporates the terms of the Exportable Agreement. IAP ¶ D.2.b.(1). The City does not challenge this formula.

Condition 3 is the opposite of Condition 1. IAP ¶ D.2.b.(3). This formula applies when: (1) demand for Intertie use among Northwest utilities is less than available Intertie capacity, and (2) California utilities want to purchase more electricity than Northwest utilities have available to sell but the amount available will not fill the Intertie to capacity. Under this condition, BPA makes Intertie transmission capacity freely available to any Northwest or Canadian utility desiring access. The City does not challenge this formula.

The text of the Condition 2 formula appears in the margin.[9] Condition 2 applies when there is a slight oversupply of North-

---

9. (2) *Condition 2.* When the Exportable Agreement allocation formula is not in effect, but BPA and other Scheduling Utilities declare amounts of power available for access to the Pacific Intertie that exceed the available Intertie Capacity determined as described in paragraph a. above, the capacity will be allocated pursuant to the following procedure:

(a) On any day the Scheduling Utilities observe as a normal workday, each Scheduling Utility shall submit to BPA declarations of daily quantities of energy and hourly capacity

it has available for sale to the Southwest for the period beginning at midnight of the day of declaration and continuing through midnight of the next normal workday.

(b) Allocations for each hour among Scheduling Utilities will be determined and will approximate the ratio of each Scheduling Utility's declaration to the sum of all declarations for each hour multiplied by the available Intertie Capacity....

IAP ¶ D.2.b.(2), 49 *Fed.Reg.* at 44,237.

west electricity but not such an extreme oversupply that Northwest utilities must generate excess electricity to avoid spilling water over their dams. IAP ¶ D.2.b.(2). In this situation (when California utilities are willing to purchase, and Northwest utilities are willing to sell, more electricity than the Intertie can handle), there is competition among Northwest utilities. Canadian utilities may not use the Intertie to enter the competition unless those utilities first enter into acceptable planning agreements with BPA. IAP ¶ E.3. No Canadian utilities currently have acceptable agreements with BPA.

Under Condition 2, all Northwest utilities (and qualified Canadian utilities, if any) wishing to sell power would notify BPA of the amount of power available for sale each day. If the total available power is greater than Intertie capacity, each seller (including BPA) is allocated a share of Intertie capacity based upon a pro rata reduction from its declared available electricity, just as it is under Condition 1. Allocations cannot be exceeded or traded even if a utility later discovers it requested too much or too little capacity.

The effect of Condition 2 is to reduce competition among Northwest utilities both for Intertie capacity and for California purchasers and to equalize the prices at which Northwest power can be sold. The question on which this litigation turns is whether the Condition 2 restrictions are consistent with BPA's statutory authority.

One related issue also has been raised in this litigation. The City challenges the formula by which the IAP calculates Intertie capacity for the purpose of allocating access under Condition 2. Instead of allocating physical Intertie capacity, BPA allocates net scheduled Intertie capacity. IAP ¶ A.8. Scheduled Intertie capacity is a measure not of physical capacity but of "capacity ... controlled ... through ownership or contract right." That capacity includes the amount of any return electricity which California utilities are obligated to return to Northwest utilities pursuant to peaking return exchange agreements. *Id.*

Because peaking return exchange agreements permit the utilities to use the Intertie, the BPA definition presumes that all electricity transactions as part of those agreements use the Intertie.

The scheduled capacity would be, therefore, larger than the physical capacity of the line if all parties to exchange agreements actually used the Intertie to return their obligation energy. But some utilities do not use the Intertie to satisfy their return obligations. The City, for example, satisfies its obligations by purchasing from British Columbia Hydro Authority electricity which is delivered to BPA without passing through the Intertie. Other utilities may purchase electricity from one Northwest utility and have that electricity transmitted to another Northwest utility to satisfy peaking return obligations. That energy, also, does not pass through the Intertie. Because scheduled capacity allocates capacity which need never be physically used, the City argues that it is arbitrary and capricious for BPA to use scheduled rather than actual capacity to allocate Intertie access.

## THIS COURT'S REVIEW

This detailed history provides the background for our analysis of the case at bar. The City asks this court to find that the IAP exceeds BPA's statutory authority and is arbitrary and capricious. Under the Administrative Procedure Act, this court may set aside an agency action if it is found to be arbitrary, capricious, an abuse of discretion, or in excess of statutory authority. 5 U.S.C. § 706(2). This standard of review is highly deferential and assumes the agency action to be valid. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Insofar as agency action is the result of its interpretation of its organic statutes, the agency's interpretation is to be given great weight. *ALCOA*, 104 S.Ct. at 2479–80 (discussing BPA administrative actions).

In reviewing actions BPA takes under its enabling legislation, this court gives substantial deference to the agency for three

reasons. First, the enabling legislation is highly technical and complex. Second, the agency was intimately involved in the drafting and consideration of the legislation at the time of its passage. *ALCOA,* 104 S.Ct. at 2480. Finally, Congress has, for nearly half a century, monitored BPA performance in electricity regulation and allocation. Statutory interpretations offered by BPA represent "contemporaneous construction of a statute by [those] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *See Central Lincoln Peoples' Util. Dist. v. Johnson,* 686 F.2d 708, 710–11 (9th Cir.1982), *rev'd on other grounds,* —— U.S. ——, 104 S.Ct. 2472, 81 L.Ed.2d 301. *See also American Paper Inst. v. American Elec. Power Service Corp.,* 461 U.S. 402, 423, 103 S.Ct. 1921, 1933, 76 L.Ed.2d 22 (1983).

■ Nevertheless, in making this review, this court must determine whether the challenged decision was based upon a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823. While this court may not substitute its judgment for that of the Bonneville Power Administrator, its factual inquiry is to be "searching and careful." *Id.*

## ALLOCATION OF INTERTIE CAPACITY[10]

■ We first examine the Administrator's authority to allocate use of the Intertie. Each of the four applicable statutes imposes restraints upon the manner in which BPA may exercise its discretion in managing electricity and operating the Intertie. A review of applicable legislation reveals the boundaries of BPA authority.

The Project Act authorizes and directs BPA to construct, operate and maintain the Intertie for transmitting federal energy.

16 U.S.C. § 832a(b). The Act makes no reference to sharing these facilities with other electricity producers. Preference in BPA sale of electricity is to be accorded to public bodies. 16 U.S.C. § 832c(a). Consequently, allocation of Intertie use is not inconsistent with BPA's statutory authority to use the federally-owned portions of the Intertie in any manner consistent with "transmitting electric energy, ... from [BPA] to existing and potential markets...." 16 U.S.C. § 832a(b).

The Preference Act was passed at the time the Intertie plan was considered and approved. *See* Pub.L. No. 88–257, 77 Stat. 844 (1964); Pub.L. No. 88–511, 78 Stat. 682 (1965) (appropriations for construction of the Intertie). The purpose of the Act was, *inter alia,* to permit interconnection of the Bonneville power system with the systems of other regions without the risk that BPA's customers in the Pacific Northwest would lose their preference for electricity needed to meet present and future needs. H.R.Rep. No. 590, 88th Cong., 2d. Sess., *reprinted in* 1964 U.S.Code Cong. & Ad. News 3342, 3342–43 (1964). Congress was concerned to ensure that this interconnection, so vital to the economic interests of both the Northwest and the Southwest, was not made at the expense of the low-cost electricity needed to support economic growth in the Northwest. *Id.* at 3342–44. At the same time that Congress recognized the availability of electricity surplus to the needs of the Northwest, it also recognized the temptation for consumers elsewhere in the West to use this cheap power for their own economic development at the expense of the Northwest. *Id.* at 3343–44.

The Act establishes a preference both for electricity sales, 16 U.S.C. § 837a, and for use of Intertie capacity to transmit that electricity. 16 U.S.C. § 837e. This is also the statute which limits the sale, delivery or exchange of BPA electricity outside the Northwest to "surplus energy and surplus peaking capacity." 16 U.S.C. § 837a. Sur-

---

**10.** The City only challenges Intertie allocation under Condition 2. We therefore address only those restrictions which apply under that Condition.

plus energy is defined to be that energy which would otherwise be wasted because of the lack of a market in the Northwest. Surplus peaking capacity is that peaking capacity for which there is no demand in the Northwest at any established rate. 16 U.S.C. § 837(c), (d).

Transmission lines used for BPA energy in the Northwest are to be made available to other users if not needed by BPA. 16 U.S.C. § 837e. The legislative history of the Act explains that

> In determining the existence of capacity excess to the needs of the Government, Federal needs reasonably forseeable may be included, but the Secretary may not decline to enter into [agreements to transmit other utilities' power] merely because he may have energy available for sale to serve the same load.

H.R.Rep. No. 590; 1964 U.S.Code Cong. & Ad.News at 3350. BPA is permitted, therefore, to reserve sufficient Intertie capacity not only for its current needs but also for its "forseeable" future needs, so long as the agency does not compete with other utilities on the mere speculation that it "may have energy available" sometime in the future to sell to the same customer.

Underlying Congressional passage of the Preference Act was its concern to ensure that BPA could repay the huge federal debt incurred in constructing Northwest hydroelectric facilities. *See* 1964 U.S.Code Cong. & Ad.News at 3382 (Additional views of Rep. Craig Hosmer). In its statement of the need for the Preference Act, the House Committee explained that construction of the Intertie would permit BPA to raise additional revenue which "would go a long way toward putting the Bonneville power system back on a sound financial basis." H.R.Rep. No. 590, 1964 U.S.Code Cong. & Ad.News at 3343.

The City has argued that the IAP violates the Preference Act, 16 U.S.C. § 837e, by automatically giving BPA priority in sale of electricity to California regardless of market price and competition from other Northwest electricity producers. Nevertheless, it is clear from the legislative history that Congress did not intend BPA to compete with other Northwest utilities for access to the Intertie. The theme of the Act is that BPA, as owner and operator of the Intertie, should be allowed preference in transmission of its electricity over the Intertie as necessary to meet its statutory mandate of being self-financing. Only if the agency still has capacity remaining on the Intertie after it has sold available and forseeable power, is it required to make the Intertie available to other utilities.

The Columbia River Act deals primarily with financing arrangements for BPA. The Act does, however, require BPA to make its facilities available to all utilities fairly once its own needs are satisfied:

> The Administrator shall make available to all utilities on a fair and nondiscriminatory basis, any capacity in the [Intertie] which he determines to be in excess of the capacity required to transmit electric power generated or acquired by the United States.

16 U.S.C. § 838d.

Neither the Act nor the Congressional Report provide any further guidance for the Administrator's discretion in making excess capacity available to other utilities. The Act recognizes, however, that BPA must make available only excess capacity, not all Intertie capacity.

The Northwest Power Act reaffirms the authority of BPA to allocate and manage Intertie capacity. 16 U.S.C. § 839f(i)(1)(B). BPA is explicitly limited to providing transmission services over the Intertie which are "not in conflict with the [BPA's] other marketing obligations," *id.*, and which do not cause a "substantial interference with [the BPA] power marketing program...." 16 U.S.C. § 839f(i)(3).[11] *See* H.R.Rep. No. 976, Part II, 96th Cong.2d Sess., *reprinted*

---

**11.** The IAP was likewise designed to "enhance BPA's power marketing program." 49 *Fed.Reg.*

at 44233.

*in* 1980 U.S.Code Cong. & Ad.News 5989, 6054.

The City argues that the IAP alters free market forces which would otherwise allocate Intertie access according to price and demand. The City's argument, however, fails because electricity generation, transmission and distribution in the Pacific Northwest have not been subject to free market forces since passage in 1937 of the Project Act which created a virtual federal monopoly over transmission of hydroelectric energy in the region. Notwithstanding the fact that BPA has permitted the operation of market forces to allocate Intertie usage at some times in the past, Congress has repeatedly expressed its intent that BPA control sale and transmission of power in the Northwest consistent with Congressional statements of policy. *See* H.R. Rep. No. 590, 1964 U.S.Code Cong. & Ad. News at 3342–44; H.R.Rep. No. 976, Part I, 96th Cong., 2d Sess., 1980 U.S.Code Cong. & Ad.News at 5989–93.[12]

The history of BPA's enabling legislation further demonstrates that Congress has repeatedly required BPA to operate in a manner which assures that the agency is fiscally selfsupporting. *See* 16 U.S.C. § 832f (BPA rate schedules designed to recover BPA costs) H.R.Rep. No. 590, 1964 U.S. Code Cong. & Ad.News at 3343 (statute designed to put BPA back on sound financial ground); 16 U.S.C. § 838g(2) (rate schedules to be based upon BPA need to recover operating and capital costs); 16 U.S.C. § 839e(a)(1) (rates to be designed consistent with sound business principles and with need to recover BPA costs); H.R. Rep. No. 976, Part I, 1980 U.S.Code Cong. & Ad.News at 6001 (BPA must be self supporting and must maintain financial independence subject to Congressional over-

sight). While market forces at times in the past may not have threatened BPA's Congressional mandate, BPA has presented reliable evidence that without a policy which carefully allocates Intertie access, it will experience significant revenue shortfalls in coming years. To the extent that the IAP is designed to mitigate projected deficits, therefore, the policy is not only statutorily authorized but statutorily mandated. *Calif. Energy Resources,* 754 F.2d at 1472; *Portland Gen. Elec. Co.,* 754 F.2d at 1477–78.

These four statutes show repeated Congressional insistence that BPA have preference in using Intertie capacity and that, so long as the agency is fair and nondiscriminatory, BPA have the discretion to allocate remaining transmission capacity. Under this court's narrow review, the IAP is neither arbitrary and capricious, nor an abuse of discretion nor in contravention of statutory authority. This court need not find that the BPA interpretation of the four statutes " 'is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' We need only conclude that it is a reasonable interpretation." *ALCOA,* 104 S.Ct. at 2480, quoting, *American Paper Inst.,* 461 U.S. at 423, 103 S.Ct. at 1933.[13]

## EXCLUSION OF CANADIAN POWER

■ The City argues that the IAP violates BPA's statutory mandate to provide Intertie access to power generated in Canada. 16 U.S.C. § 837e. *See* H.R.Rep. No. 590, 1964 U.S.Code Cong. Ad.News at 3350 (Canadian energy "stands on the same basis as any other non-Federal energy"); 16 U.S.C. § 838d (capacity must be made available on a fair and nondiscriminatory

**12.** The City argues that, by displacing competition, the IAP violates the antitrust laws. That argument is frivolous because the antitrust laws do not apply to the federal government. *See Sea-Land Service, Inc. v. Alaska R.R.,* 659 F.2d 243, 244 (D.C.Cir.1981).

**13.** The legislative scheme is confusing and overlapping. It is not at all clear that Congress considered all the ramifications of the language

used in different enactments since the Project Act was enacted in 1937. Nevertheless, statutes dealing with the same subject must be read together and harmonized where possible. *See* 2A *Sutherland on Statutory Construction* § 52.-02. The BPA policy is not inconsistent with the legislative scheme and is not an abuse of discretion.

basis). The IAP currently prohibits Intertie access for Canadian power under Conditions 1 and 2.[14]

There are two types of Canadian power for which Intertie access could be provided. The first is Canadian treaty power, *see* 16 U.S.C. § 837h, which is firm power generated in the Northwest as a result of water flows from dams on Canadian rivers. Columbia River Basin Treaty, 15 U.S.T. 1555, TIAS No. 5638 (Jan. 17, 1961). *See* M.C. Blumm, 58 Wash.L.Rev. at 215–19; BPA, *Columbia River Power for the People: A History of Policies of the Bonneville Power Administration* 227–36 (1981). Firm treaty power is not affected by this litigation.[15] BPA is obligated to afford preference to firm treaty power. 16 U.S.C. §§ 837e, 837h.

The second type of power is nontreaty surplus power which Canadian utilities (particularly B.C. Hydro) sell to California utilities and which is wheeled to those purchasers over the Intertie. Surplus power does not enjoy any preference at all. The agency:

> *may enter into agreements* for the wheeling of energy generated in Canada, but such energy ... does not have the priority granted to Federal energy and Canada's entitlement to [treaty] power benefits....

H.R.Rep. No. 590, 1964 U.S.Code Cong. & Ad.News at 3350 (emphasis added). That statement is in contrast to the immediately prior paragraph in the legislative history which *requires* BPA to make excess Intertie capacity available to other non-Federal utilities.

The legislative history of both the Preference Act and the Columbia River Act demonstrates that Congress intended that the Intertie be used primarily for the benefit of Northwest and Southwest utilities and not for the benefit of Canadian utilities. *Cf.* 16 U.S.C. § 838d (excess Intertie capacity to be made available on a fair and nondiscriminatory basis); H.R.Rep. 93–1375, 93d Cong.2d Sess., *reprinted in,* 1974 U.S.Code Cong. & Ad.News 5810, 5814 (section 838d "is not intended to represent a policy having application other than in the Pacific Northwest"). While Canadian treaty power is to be accorded preference in Intertie allocation, nontreaty power is given nonpreference Intertie access, only once BPA chooses to exercise its authority to enter into wheeling agreements. The legislative history indicates no Congressional mandate that BPA must enter into such agreements. *See* H.R.Rep. No. 590, 1964 U.S.Code Cong. & Ad.News at 3350. *See generally* U.S. Dep't of the Interior, Report to the Appropriations Committees of the Congress of the United States Recommending a Plan of Construction and Ownership of EHV Electric Interties Between the Pacific Northwest and Pacific Southwest, at X, 2, 33–34 (1964) (discussing allowing Intertie access for Canadian treaty power without any reference to other Canadian power sales).

## ALLOCATION OF SCHEDULED CAPACITY

Instead of allocating physical Intertie capacity, the IAP allocates contractual electricity flow, known as scheduled capacity. The agency's use of scheduled capacity is based on the agency's conclusion that the scarce commodity being allocated is not physical Intertie capacity but interregional energy exchange between California and

---

**14.** Access by Canadian utilities under Condition 2 is dependent upon those utilities' "participation in the Pacific Northwest's coordinated planning and operation to a greater extent than in the past, or agreement to provide other appropriate consideration of value to the Pacific Northwest." IAP ¶ E.3, 49 *Fed.Reg.* 44237. This clause is entirely consistent with the environmental planning concerns expressed in the Northwest Power Act. *See* 16 U.S.C. § 839b. As we have already noted, negotiations to enter into such an agreement have not been successful.

**15.** Because Canada did not need the power to which it was entitled under the Treaty, treaty power was sold back to BPA under the Canadian Storage Power Exchange. BPA sold this firm power to California utilities. The last remaining contract for the sale of this power to California utilities expired two years ago. *See* D.W. Meek 13 Env'tl L. at 894–96.

the Northwest. Because of exchange agreements, electricity is transmitted both into and out from both regions. Consequently, the IAP allocates the sum total of all energy exchange, whether or not the energy is physically transmitted over the Intertie. This enables BPA to coordinate scheduling of Intertie access so that purchases and sales between utilities can be offset against each other. Allocation of scheduled capacity is apparently an established industry practice designed to promote equitable cost sharing and efficient planning. Evidence presented by BPA suggests that this is a more efficient use of the Intertie than is allocation according to physical capacity.[16]

■ Although the City's objections to the use of scheduled capacity as unwise may have some validity, a court is not the proper forum in which to address such extremely technical, discretionary issues. Scheduling transmission service capacity is a highly technical field. Congress has consistently committed broad discretion to BPA. This court does not substitute its judgment for that of the administrative agency in technical fields within the agency's unique expertise. *ALCOA,* 104 S.Ct. at 2480; *Pacific Gas & Elec. Co. v. FERC,* 746 F.2d 1383, 1387 (9th Cir.1984). *See Cincinnati Gas & Elec. Co. v. FERC,* 724 F.2d 550, 554 (6th Cir.1984).

### CONCLUSION

The four BPA enabling statutes must be read in *para materia.* Two common themes appear clear from these statutes. The first is that BPA is required to market federal power in a manner which ensures that the agency is self-supporting. Secondly, BPA is required to allocate use of federally-owned transmission facilities in a manner which accords preference first to transmission of federal power and then to transmission of other Northwest-generated pow-

er. Once such preferences are accommodated, the agency is prohibited from denying access to the Intertie by other extraregional utilities within the United States. BPA is permitted, but not required, to enter into wheeling agreements to transmit Canadian-generated power.

Recognizing these common themes, we find that the IAP is consistent with BPA statutory authority and is not an arbitrary and capricious exercise of its discretion. Accordingly, we uphold the validity of the Near Term Intertie Access Policy.

---

16. The agency has presented evidence to show that, in the last five months of 1984 (including four months in which the IAP controlled Intertie access), the Intertie was used to 93 per cent of its capacity. During a comparable period in 1983, the Intertie was used to 81 per cent of capacity. The BPA attributes this 12 per cent increase in Intertie usage to more efficient allocation of capacity under the IAP.