**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PUBLIC POWER COUNCIL, INC.,
                    *Petitioner,*

            v.

BONNEVILLE POWER
ADMINISTRATION,
                    *Respondent,*

PORTLAND GENERAL ELECTRIC
COMPANY,
                    *Intervenor.*

No. 04-73240

BPA No.
SN-03

CANBY UTILITY BOARD,
                    *Petitioner,*

PORTLAND GENERAL ELECTRIC
COMPANY,
                    *Intervenor,*

            v.

BONNEVILLE POWER
ADMINISTRATION,
                    *Respondent.*

No. 04-73934

BPA No.
SN-03 Rate

ALCOA INCORPORATED,
                                    *Petitioner,*

PORTLAND GENERAL ELECTRIC
COMPANY,
                                    *Intervenor,*

            v.

BONNEVILLE POWER
ADMINISTRATION,
                                    *Respondent.*

No. 04-73939

BPA No.
EF03-2011-000

INDUSTRIAL CUSTOMERS OF
NORTHWEST UTILITIES; BENTON
RURAL ELECTRIC ASSOCIATION;
COLUMBIA - SNAKE RIVER
IRRIGATORS ASSOCIATION,
                                    *Petitioners,*

            v.

BONNEVILLE POWER
ADMINISTRATION,
                                    *Respondent.*

No. 04-73952

BPA No.
Power Act

OPINION

On Petitions for Review of an Order of the
Bonneville Power Administration

Argued and Submitted
March 8, 2006—Portland, Oregon

Filed April 4, 2006

Before: Ferdinand F. Fernandez, A. Wallace Tashima, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Fernandez

## COUNSEL

Nancy Baker and Mark R. Thompson, Portland, Oregon, for Public Power Council.

Paul M. Murphy, Murphy & Buchal LLP, Portland, Oregon, for Canby Utility Board.

William H. Walters, Miller Nash LLP, Portland, Oregon, for Alcoa Incorporated.

Melinda J. Davison, Davison Van Cleeve, PC, Portland, Oregon, for Industrial Customers of Northwest Utilities, Benton Rural Electric Association, and Columbia-Snake River Irrigators Association, Michael J. Gianunzio, Everett, Washington, for Public Utility District No. 1 of Snohomish County, Washington.

Kurt R. Casad, Special Assistant U.S. Attorney, Portland, Oregon, for Bonneville Power Administration.

Loretta Mabinton, Assistant General Counsel, Portland, Oregon, for Portland General Electric Company; Gary Dahlke, Paine, Hamblen, Coffin, Brooke & Miller LLP, Spokane, Washington, for Avista Corporation; James R. Thompson, Boise, Idaho, for Idaho Power Company; W. Wayne Harper, Butte, Montana, NorthWestern Energy; Stephen C. Hall, Stoel Rives LLP, Portland, Oregon, for PacifiCorp; Kirstin S. Dodge, Perkins Coie LLP, Bellevue, Washington, for Puget Sound Energy, Inc., intervenors.

## OPINION

FERNANDEZ, Circuit Judge:

Public Power Council, Inc., and others (collectively PPC) petition for a review of the decision of the Bonneville Power Administration (BPA) to trigger the Safety-Net Cost Recovery Adjustment Clause (SN CRAC) portion of its General Rate Schedule Provisions (GRSPs), as a result of which a rate setting proceeding took place. Canby Utility Board also petitions for a review on the basis that because it had a special contract with BPA, its rates could not be changed in any event. We deny the petitions.

### BACKGROUND

BPA is a "self-financing power marketing agency," which markets wholesale electricity from federal hydroelectric plants and several other power plants in the Pacific Northwest. *Aluminum Co. of Am. v. Bonneville Power Admin.*, 903 F.2d 585, 588 (9th Cir. 1990). "It owns and operates approximately eighty percent of the Pacific Northwest's high-voltage transmission system and markets approximately forty percent of the electric power consumed in the Pacific Northwest." *Indus. Customers of N.W. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 641 (9th Cir. 2005). "BPA's customers include

federal agencies, public bodies (including public utilities), private utilities," and Direct Service Industrial customers. *Kaiser Aluminum & Chem. Corp. v. Bonneville Power Admin.*, 261 F.3d 843, 845 (9th Cir. 2001).

Essentially, BPA is governed by four organic statutes: "the Bonneville Project Act of 1937, 16 U.S.C. §§ 832-832m ('Project Act'); the Pacific Northwest Consumer Power Preference Act of 1964, 16 U.S.C. §§ 837-837h ('Preference Act'); the Pacific Northwest Federal Transmission System Act of 1974, 16 U.S.C. §§ 838-838*l* ('Transmission Act'); and the Pacific Northwest Electric Power Planning and Conservation Act of 1980, 16 U.S.C. §§ 839-839h ('Northwest Power Act')." *Kaiser Aluminum & Chem. Corp.*, 261 F.3d at 845. It is authorized to issue and sell bonds to the United States Treasury "to assist in financing the construction, acquisition, and replacement of the transmission system." 16 U.S.C. § 838k(a). However, it must repay a projected amount of those bonds each fiscal year; if it fails to do so, the Treasury, with some exceptions, may increase the applicable interest rate for that year's outstanding bonds. *Id.*

Since 1974, BPA's electricity sales have been its source of revenue. *See Indus. Customers*, 408 F.3d at 641. Thus, the Northwest Power Act requires BPA "to establish rates that will produce sufficient revenues to ensure BPA's fiscal independence and repay the U.S. Treasury for the federal funds that were borrowed to build the projects in the Federal Columbia River Power System." *Cal. Energy Comm'n v. Bonneville Power Admin.*, 909 F.2d 1298, 1303 (9th Cir. 1990). At the same time, "[t]he statute also requires that rates be as low as possible consistent with sound business principles." *Cent. Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101, 1116 (9th Cir. 1984).

In order to fulfill its mission, BPA must periodically revise its rates. *See Indus. Customers*, 408 F.3d at 642. It does so pursuant to § 7 of the Northwest Power Act (16 U.S.C.

§ 839e). Its power rates, other charges, cost adjustments and rate methodology are then defined in its wholesale power rate schedules. The rate schedules contain GRSPs, which set out the provisions that govern the various rates in question. *See Indus. Customers*, 408 F.3d at 642.

In August of 1999, BPA proposed to revise its wholesale power rates for the five year period between October 1, 2001, and September 30, 2006 (the "WP-02 Rates").[1] BPA conducted hearings in accordance with § 7(i) of the Northwest Power Act (16 U.S.C. § 839e(i)). Those are hereafter referred to as the "WP-02 Rate Proceeding." On May 10, 2000, BPA completed the final record of decision for the proposed WP-02 Rates (May 2000 ROD). On July 6, 2000, BPA filed its proposed WP-02 Rates with the Federal Energy Regulatory Commission (FERC) for approval.

During the summer of 2000, however, wholesale power rates rose precipitously. As a result, BPA's proposed WP-02 Rates became far more attractive to prospective customers. Its preference customers thus sought to purchase much more power for the 2002-2006 period than BPA had anticipated. Supplying that would require BPA to make up any shortfall in its production capacity by purchasing power on the open market. It, therefore, became concerned that the WP-02 Rates established in the May 2000 ROD would not be sufficient to cover its costs. Consequently, on August 4, 2000, BPA filed a motion with FERC to stay review of BPA's WP-02 Rates. *See* BPA's Proposed Safety-Net Cost Recovery Adjustment Clause Adjustment to 2002 Wholesale Power Rates, 68 Fed. Reg. 12,048, 12,049 (Mar. 13, 2003).

On September 4, 2000, BPA notified FERC that it would pursue modifications to the WP-02 Rates. In October 2000, after a public comment period, it notified FERC and parties to the WP-02 Rate Proceeding that it was initiating a limited

---

[1]BPA's fiscal year runs from October 1 to September 30.

§ 7(i) (16 U.S.C. § 839e(i)) hearing, in which it would revise the WP-02 Rates in order to address its increased load obligations and high market prices. It matched its actions to its words, and on December 1, 2000, it proposed amendments to the proposed WP-02 Rates. BPA's Proposed Amendments to 2002 Wholesale Power Rate Adjustment Proposal, 65 Fed. Reg. 75,272 (Dec. 1, 2000); *see also Indus. Customers*, 408 F.3d at 642. Once again, however, BPA's announcement of proposed rates was followed by a downturn in its financial outlook. Its forecast for cash reserves dropped substantially, while market prices rose significantly more than expected. Those developments induced BPA to make various additional changes to its proposed amendments to the WP-02 Rates. *See Indus. Customers*, 408 F.3d at 642. That process led to the filing of the WP-02 Supplemental Proposal (June 2001 ROD) and to the ultimate adoption of three Cost Recovery Adjustment Clauses (CRACs) as a part of the GRSPs. Those were:

(1)   The Load Based CRAC (LB CRAC), which triggers if BPA's augmentation cost (cost of purchasing power on the open market) exceeds the forecasted amount. Essentially, the LB CRAC is a formula for increasing base rates by a certain percentage, depending on what BPA pays to acquire excess power.

(2)   The Financial Based CRAC (FB CRAC), which triggers if BPA's accumulated net revenues fall below a certain threshold. Like the LB CRAC, the triggering of the FB CRAC results in a percentage increase to BPA's base power rates.

(3)   Finally, the SN CRAC, which triggers if, after implementation of the FB CRAC, BPA has missed, or reasonably expects to miss, a payment to the United States Treasury or another creditor. The disputes here revolve around the SN CRAC. As we have indicated previously:

Under the GRSP, the Safety-Net CRAC would be available if the Administrator determined that, after

implementation of the Financial-Based CRAC and any adjustments, either of the following conditions existed:

- The BPA forecasts a fifty percent or greater probability that it will nonetheless miss its next payment to Treasury or other creditor, or

- The BPA has missed a payment to the Department of the Treasury or has satisfied its obligation to the Department of the Treasury but has missed a payment to any other creditor.

*Id.* As is apparent, unlike the LB CRAC and the FB CRAC, the SN CRAC is not a precise formula; it does not, by itself, revise BPA rates. Rather, if triggered, the SN CRAC allows BPA to revise the FB CRAC parameters in order to "achieve a high probability that the remainder of Treasury payments during the [WP-02] rate period will be made in full." *Id.* at 642-43 (internal quotation marks omitted).

After the adoption and FERC interim approval of the new CRACs, BPA's financial condition began to deteriorate further. By January of 2003, an updated financial forecast showed that its net revenue gap for the 2002-2006 period had increased to $950,000,000. BPA analyzed its Treasury Payment Probability (TPP) to determine whether to trigger the SN CRAC. The results of that analysis indicated a twenty-six percent TPP. BPA's Administrator thus determined that the SN CRAC trigger requirements had been satisfied—BPA had less than a fifty percent chance of making its next Treasury payment, which was due in September of 2003. Thus, on February 7, 2003, BPA notified its customers and interested parties that BPA was triggering the SN CRAC.

Pursuant to the GRSPs, BPA held workshops and published notice in the Federal Register. BPA Proposed Safety-Net Cost Recovery Adjustment Clause Adjustment to 2002 Wholesale

Power Rates, 68 Fed. Reg. 12,048. BPA then held a formal expedited hearing under § 7(i) (16 U.S.C. § 839e(i)) to establish changes in the amount, duration, and timing parameters of the FB CRAC.[2] On June 30, 2003, after the conclusion of the SN CRAC hearing, BPA issued its final SN-03 CRAC ROD with an accompanying appendix, and FERC granted final confirmation and approval. Order Confirming and Approving Rates on a Final Basis, 107 FERC ¶ 61,138 (F.E.R.C. May 10, 2004). These petitions followed.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction to review final actions of BPA. 16 U.S.C. § 839f(e)(5); *see also Indus. Customers*, 408 F.3d at 644.

Section 9(e)(2) of the Northwest Power Act (16 U.S.C. § 839f(e)(2)) provides that the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, governs the scope of judicial review of BPA's final actions. Under the APA, we must uphold BPA's actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In other words, we may not substitute our own judgment for that of BPA; we must simply assess whether BPA relied on improper factors, failed to consider an important aspect of the question, "offered an explanation for its decision that runs counter to the evidence before [it], or [rendered a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77 L. Ed. 2d 443 (1983); *see also Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir. 2001). This highly deferential standard presumes BPA's actions to be valid. *Cal. Energy Comm'n*, 909 F.2d at 1306.

---

[2]At that time, certain BPA customers asked us to review BPA's trigger determination. We rejected the request because BPA's decision was not yet final. *Indus. Customers*, 408 F.3d at 644-45.

We also give substantial deference to actions that BPA undertakes pursuant to its enabling legislation. *See Dep't of Water & Power v. Bonneville Power Admin.*, 759 F.2d 684, 690-91 (9th Cir. 1985); *see also Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44, 104 S. Ct. 2778, 2781-82, 81 L. Ed. 2d 694 (1984). And we have recognized that Congress "granted BPA an unusually expansive mandate to operate with a business-oriented philosophy. Accordingly, it seems particularly wise to defer to the [BPA's] actions in furthering its business interests . . . ." *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1171 (9th Cir. 1997).

Rate making decisions are also entitled to deference. *See Cal. Energy Comm'n*, 909 F.2d at 1306 ("BPA is entitled to . . . deference in ratemaking decisions, even where it has an interest in the outcome."). It is true that "final determinations regarding rates . . . shall be supported by substantial evidence in the rulemaking record . . . considered as a whole." 16 U.S.C. § 839f(e)(2). Yet, substantial evidence is simply "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (internal quotation marks omitted).

## DISCUSSION

Principally, the arguments before us revolve around the claim that BPA improperly invoked the SN CRAC trigger. We will, therefore, first consider those arguments. We will then take up Canby's separate arguments.

A.  *SN CRAC Trigger Decision*

BPA was entitled to trigger the SN CRAC proceedings if it forecasted a fifty percent or greater probability that it would miss the next payment to the United States Treasury. Here,

BPA made that forecast, but PPC asserts that the forecast was made arbitrarily and capriciously because at least $76,000,000 of available cash was not considered. We agree with BPA that it did not need to consider that cash and, therefore, reject PPC's claims. We shall explain.

[1] It is noteworthy that the SN CRAC does not itself set any new rates; rather, once it is triggered, a proceeding to determine the amount of the increase in rates, if any, is commenced. Moreover, the SN CRAC does not spell out any particular methodology that BPA must use in making the forecast that will trigger the proceeding. It does not state that all cash reserves must be considered to be available for use, or even that there must be an emergency. It simply refers to the making of a "forecast." Certainly, nothing in the provision indicates that before the SN CRAC trigger can be invoked, BPA must find itself driven to the wall and must project the use of every last scrap of available cash that could conceivably be used to make a payment to the Treasury. Of course, $76,000,000 does not exactly sound like a scrap, so more must be said about that amount and its provenance. As it is, the cash came from a particular source.

Energy Northwest (ENW) is a joint operating agency that manages several power generating stations in the Pacific Northwest. BPA markets the power generated at ENW's Columbia Generating Station. In exchange, BPA is contractually obligated to pay the principal and interest on ENW-issued bonds that were sold in order to finance ENW's generation projects. As a result, when ENW refinances its bond debt at BPA's request, BPA is temporarily relieved of making those principal and interest payments—that can free up significant amounts of cash for BPA's use.

At an earlier time, ENW had agreed to extend the principal due in fiscal year 2003 into the 2013-2018 period by refinancing the bonds. The result was that BPA would have up to $315,000,000 in surplus cash available to it, and by February

2003, when the SN CRAC was triggered by BPA, it had already realized $76,000,000 from that particular source. That is the money which PPC insists BPA had to take into account in making its TPP forecast, and it is essentially undisputed that had the amount been taken into account, the TPP would have exceeded fifty percent. Therefore, the SN CRAC could not have been triggered. But it is not quite as simple as that.

What PPC chooses to overlook is the fact that ENW was not required to make the refinancing decision in the first place, but that it was induced to do so for a particular business reason. That reason was bound up with BPA's Debt Optimization Program, a program that had been in place for some three years before the trigger date came around. Under the Debt Optimization Program, when ENW agrees to refinance its bonds, the cash that is freed up is to be used by BPA for the purpose of paying down BPA's United States Treasury debt, which carries a higher interest rate. That paydown has significant financial benefits for BPA in the long run and, ultimately, reduces its fixed debt costs. It does not, however, affect BPA's obligation to make the current payment.

Because the very reason for the ENW refinancing was to fund a particular use of the savings thereby generated, sound and honorable business practices pointed to BPA's use of the money in the manner anticipated by both it and ENW. Most immediately, BPA would breach faith with ENW were it to divert the money to a use other than that intended. But there is more. In essence, that diversion would also have a bad effect on the market for ENW bonds because analysts would see that the saved money was just being used up on what amounted to current BPA expenses, rather than being used to reduce future expenses. Moreover, the high interest rate debt to the United States Treasury would remain as a burden. In a sense, the seed corn of the future would be devoured in the famine of the present. And, of course, the ultimate financial problem would not be solved, but, rather, would be deferred to future years. In the long term, the ENW bond debt would

remain, while the debt to the United States Treasury would not be commensurately reduced. That might well then require BPA to raise its power rates even further in order to cover accumulated shortfalls.

**[2]** In light of those eximious reasons for BPA's forecasting in the way it did, we are not able to say that BPA failed to proceed in accordance with "sound business principles." *Ass'n of Pub. Agency Customers*, 126 F.3d at 1171 (internal quotation marks omitted). On the contrary, this is a situation where "it seems particularly wise to defer to the agency's actions in furthering its business interests, especially when the agency is responding to unprecedented changes in the market." *Id.* Especially is the above true when we reflect on the fact that the SN CRAC is itself a part of the GRSPs, which are much more than mere contract terms. *See Cent. Lincoln*, 735 F.2d at 1128. They are entirely bound up with BPA's rate making responsibilities, and we owe deference to the BPA in that area. *See Cal. Energy Comm'n*, 909 F.2d at 1306; *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S. Ct. 2381, 2386-87, 129 L. Ed. 2d 405 (1994).

**[3]** In fine, although other approaches were possible, even reasonable, the confluence of the reasons given by BPA and the deference we owe to it preclude us from determining that BPA acted arbitrarily or capriciously when it made its forecast and pulled the SN CRAC trigger.

B.   *The Canby Claims*

Canby asserts that even if the SN CRAC was properly invoked and the SN CRAC proceedings were properly conducted,[3] it cannot be subject to the changed rates. That is so,

---

[3]Canby does complain that the SN CRAC was not properly followed in one respect because it went beyond the parameters set forth in the June 2001 ROD, but that issue was not raised in the proceedings before the BPA and cannot now be raised before us. *See Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019-20 (9th Cir. 2004); *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 910-11 (9th Cir. 2003).

it says, because of a provision in its contract with BPA.[4]

On September 15, 2000, Canby entered into a five-year contract to purchase power from BPA. That contract was to be subject to the WP-02 Rates for which the 2002 GRSPs had not yet been adopted. When they were adopted, they included the SN CRAC. None of this is disputed.

But when BPA first sent the proposed contract to Canby, it included a provision that allowed BPA to adjust rates pursuant to the "Cost Recovery Adjustment Clause in the 2002 GRSPs, or successor GRSPs." That is a fairly standard provision because most contracts are for a ten-year period, whereas sets of GRSPs are for a five-year period. Canby asked that the "or successor GRSPs" language be stricken. BPA agreed, and the final contract was revised accordingly.

Canby now argues that the eliding of the language "or successor GRSPs" was, in effect, designed to eliminate application of the SN CRAC to its rates. It would be surprising to discover that at a time of great uncertainty, BPA chose to tie its own hands by the elliptical route of eliminating a few words from a contract. Canby submitted no evidence at the SN CRAC hearings to support that reading of the contract.[5]

---

[4]Were Canby's claim a pure contract claim, we would not have jurisdiction over it. As it is, the claim is inexorably intertwined with the rate proceedings themselves. Thus, jurisdiction does lie in this court. *See Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 926-27 (9th Cir. 2002); *Cent. Elec. Coop., Inc. v. Bonneville Power Admin.*, 835 F.2d 199, 203-04 (9th Cir. 1987); *Atl. Richfield Co. v. Bonneville Power Admin.*, 818 F.2d 701, 705 (9th Cir. 1987) (per curiam); *Pac. Power & Light Co. v. Bonneville Power Admin.*, 795 F.2d 810, 814-16 (9th Cir. 1986).

[5]We are well aware of the fact that Canby tried to submit some evidence in support of its argument when it briefed its position at the BPA, and included some information in the excerpts of record that it filed with us. But Canby could not expand the administrative record by submitting evidence with a brief filed with the BPA after the hearing closed. *See* Proce-

**[4]** When the brume generated by Canby's arguments is blown away, it becomes apparent that BPA properly deemed Canby to be subject to the SN CRAC proceedings and the results of those proceedings. Simply put, once it is agreed that the SN CRAC, which contemplated changes to the FB CRAC, was part of the 2002 GRSPs to which Canby was subject, it inexorably follows that the utilization of those very provisions in the intended manner merely modified the existing CRAC portion of the GRSPs, as was contemplated by the provisions themselves. That did not, and could not, result in "successor GRSPs." The 2002 GRSPs remained intact in a somewhat different and modified form, but a form contemplated when they were adopted. To put it another way, just as a human being can use an exercise or study regimen to modify himself without creating a successor person,[6] so too could the GRSPs be modified by use of the SN CRAC without creating a successor to the GRSPs themselves.

**[5]** In short, Canby cannot avoid the adjusted rates by pointing to the absence of the phrase "or successor GRSPs" in its contract with BPA. Simply put, it was reasonable for BPA to conclude that the deleted phrase was mere surplusage in a five-year contract.

## CONCLUSION

When BPA adopted the WP-02 Rates, which included the

---

dures Governing Bonneville Power Administration; Rate Hearings § 1010.13, 51 Fed. Reg. 7611, 7613-14, 7617 (Mar. 5, 1986). And we have already stricken that evidence from the excerpts. Therefore, we have confined ourselves to the administrative record itself. *See* 16 U.S.C. § 839f(e)(2); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44, 105 S. Ct. 1598, 1607, 84 L. Ed. 2d 643 (1985); *S.W. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450-51 (9th Cir. 1996).

[6]Of course, we might colloquially say that "X is a new man," but we do not mean that a successor human being has come on the scene.

three CRACs, it did so in a time of great uncertainty. Thus, although everyone undoubtedly hoped it would never have to be used, the SN CRAC, which allowed for an upward adjustment of rates, was made a part of the GRSPs. Alas, BPA fell on hard times and decided to trigger the SN CRAC in order to share its pain with its customers. Everyone's hopes were dashed.

PPC, however, clinging to a fragment of a hope, has asserted that BPA improperly triggered the SN CRAC. We are constrained to hold that BPA did not act in a manner that was either arbitrary or capricious when it did so. Nor had BPA disabled itself from sharing its pain with Canby. Ah, if only there were some anodyne for all of the participants in this saga. But none there is.

Petitions DENIED.