909 F.2d 1298
 CALIFORNIA ENERGY COMMISSION, Petitioner,
Puget Sound Power & Light Company, Washington Water Power
Company ("WWP"), Petitioner-Intervenor,
v.
BONNEVILLE POWER ADMINISTRATION; U.S. Department of Energy,
Respondents,
Association of Public Agency Customers; Public Power
Council; Public Utility District No. 1 of Chelan County,
Washington; Pacificorp, DBA Pacific Power & Light Company
("Pacific"); Public Utility District No. 2 of Grant County,
Washington; Western Public Agencies Group ("WPAG");
Montana Power Company; City of Seattle, City Light
Department ("City"); Public Generating Pool ("PGP");
Eugene Water & Electric Board ("EWEB"); Director Service
Industrial Customers ("DSIS"), Respondent-Intervenor.
PACIFIC NORTHWEST GENERATING COMPANY ("PNGC"), Petitioner,
v.
BONNEVILLE POWER ADMINISTRATION; U.S. Department of Energy;
United States of America, Respondents.
VANALCO INC.; Aluminum Company of America; Columbia Falls
Aluminum Company, Petitioners,
Washington Water Power Company ("WWP"); Puget Sound Power
and Light Company, Petitioner-Intervenor,
v.
BONNEVILLE POWER ADMINISTRATION, Respondent,
Portland General Electric Company; Association of Public
Agency Customers; ARCO; Montana Power Company; Public
Generating Pool ("PGP"); Eugene Water & Electric Board
("EWEB"); Non-Generating Public Utilities ("NGPU"),
Respondent-Intervenor.
CALIFORNIA PUBLIC UTILITIES COMMISSION, Petitioner,
Puget Sound Power and Light Company; The Department of
Water & Power of the City of Los Angeles; Public Service
Department of the City of Burbank; Public Service
Department of the City of Glendale; Water & Power
Department of the City of Pasadena; San Diego Gas &
Electric Company and Southern California Edison Company;
Pacific Gas and Electric Company, Petitioner-Intervenor,
v.
BONNEVILLE POWER ADMINISTRATION; U.S. Department of Energy,
Respondents,
Pacific Power & Light Company; Eugene Water & Electric
Board ("EWEB"); Public Generating Pool ("PGP"); Northwest
Power Planning Council; Direct Service Industrial Customers
("DSIS"), Respondent-Intervenor.
 Nos. 88-7280, 88-7315, 88-7318 and 88-7319.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 5, 1990.
Decided July 26, 1990.
 
 William M. Chamberlain, Sacramento, Cal., for petitioners California Energy Com'n.
 Paul M. Murphy, Portland, Or., for intervenors Direct Service Indus. Customers and Western Public Agencies Group.
 Sherilyn Peterson, Seattle, Wash., for Puget Sound Power & Light Co.
 Thomas Millet, Dept. of Justice, Washington, D.C., for BPA.
 Jay T. Waldron, Portland, Or., for Public Generating Pool.
 Petition to Review Bonneville Power Administration Agency Action.
 Before CANBY, and LEAVY, Circuit Judges, and ORRICK, District Judge.*
 CANBY, Circuit Judge:
 
 
 1
 This case involves consolidated challenges to the Bonneville Power Administration's ("BPA") Long-Term Intertie Access Policy ("LTIAP") which allocates access to the Pacific Northwest-Pacific Southwest Intertie, a system of high voltage lines transmitting federal and non-federal power between the two regions. The LTIAP is being attacked on several fronts by parties with diverse and sometimes competing interests. None of the parties with an interest in access to the Intertie is completely satisfied with the policy. Upon the whole record, however, we conclude that the LTIAP reasonably balances the interests of the affected parties in a manner consistent with the directives of Congress.
 
 BACKGROUND
 A. BPA and the Intertie
 
 2
 BPA is a federal agency within the Department of Energy that produces and markets power produced from dams that comprise the Federal Columbia River Power System. BPA also oversees access to the Intertie. The Intertie, completed in 1968, was designed to even out the peaks and troughs in the production and consumption of power in the Northwest and Southwest. During most of the year the Northwest produces more electricity than it can use and the Southwest experiences particularly heavy consumption. Less frequently, this pattern is reversed with the Northwest experiencing heavy demand and the Southwest able to produce surplus power. The Intertie allows the regions to assist each other during times of heavy demand.
 
 
 3
 That portion of the Intertie extending north of Oregon's border with California and Nevada is owned by BPA, Portland General Electric, and Pacific Power & Light, with BPA owning approximately 80% of the capacity. The southern end of the Intertie is owned by a group of California utilities, with PG & E, Southern California Edison, the Los Angeles Department of Water and Power, and San Diego Gas & Electric owning approximately 80% of the capacity.
 
 B. Governing Statutory Authority
 
 4
 The primary authority, obligations and restrictions which govern BPA's operation of the Intertie are found in four statutes: the Pacific Northwest Electric Power Planning and Conservation Act of 1980, 16 U.S.C. Secs. 839-839h. ("Northwest Power Act"); the Federal Columbia River Transmission System Act of 1974, 16 U.S.C. Secs. 838-838k. ("Transmission Act"); the Pacific Northwest Consumer Power Preference Act of 1964, 16 U.S.C. Secs. 837-837h. ("Preference Act"); and the Bonneville Project Act of 1937, 16 U.S.C. Secs. 832-832l. ("Project Act").
 
 
 5
 The Northwest Power Act requires BPA, in marketing federal power, to establish rates that will produce sufficient revenues to ensure BPA's fiscal independence and repay the U.S. Treasury for the federal funds that were borrowed to build the projects in the Federal Columbia River Power System. 16 U.S.C. Secs. 838g and 839e(a)(1). At the same time, Congress requires that BPA market federal power "with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles...." 16 U.S.C. Secs. 838g; see also 839e(a)(1). Under the Preference Act, BPA must give priority to public bodies, 16 U.S.C. Sec. 832c(a), and to purchasers within the Northwest, 16 U.S.C. Sec. 837a. Sales to purchasers outside of the Northwest are limited to energy "which would otherwise be wasted because of the lack of a market therefor in the Pacific Northwest at any established rate." 16 U.S.C. Sec. 837(c); see also Secs. 837(d) and 837a.
 
 
 6
 In allocating limited transmission capacity, BPA must give itself priority. 16 U.S.C. Sec. 837e. Nevertheless, it must transmit non-federal power to the extent that the Federal transmission lines have capacity not needed to transmit federal power. Id. Congress directed BPA to reserve sufficient Intertie capacity to meet "current" and "foreseeable" federal needs. Department of Water and Power of Los Angeles v. Bonneville Power Administration, 759 F.2d 684, 692 (9th Cir.1985) ("LADWP "). That excess capacity is to be made available to non-federal utilities "on a fair and nondiscriminatory basis." 16 U.S.C. Sec. 838d.
 
 
 7
 The authority to transmit non-federal power is limited in two additional ways. First, the transmission must not be in conflict with BPA's other marketing obligations, applicable operating limitations or existing contractual obligations. 16 U.S.C. Sec. 839f(i)(3). Second, any such transmission must be "[a]t the request and expense of any customer or group of customers" that sell power by transmitting it on the Intertie. 16 U.S.C. Sec. 839f(i)(1).
 
 
 8
 In addition to these somewhat conflicting responsibilities to maintain low rates, repay the federal treasury, and provide transmission access for other utilities, BPA must also "protect, mitigate, and enhance fish and wildlife" affected by the operation of the federal hydroelectric system. 16 U.S.C. Sec. 839b(h)(10).
 
 C. The Long-Term Intertie Access Policy
 
 9
 The LTIAP is a result of BPA's attempt to balance the mandates of its governing statutes. The long-term policy had its roots in two temporary allocation policies--the Interim Intertie Access Policy and the Near Term Intertie Access Policy ("NTIAP"). We found those policies to be within BPA's statutory authority and consistent with the relevant statutes. See LADWP, 759 F.2d at 695; California Energy Resources Conservation and Development Commission v. Bonneville Power Administration, 831 F.2d 1467, 1469 (9th Cir.1987), cert. denied, 488 U.S. 818, 109 S.Ct. 58, 102 L.Ed.2d 36 (1988) ("CEC "). In 1985 and 1986, BPA held public meetings on long-term Intertie access policy issues which culminated in the release of a proposed LTIAP in October, 1986. After receiving public comment, BPA issued a revised LTIAP in December, 1987. In May, 1988, after further public comment, BPA adopted the final LTIAP. The policy provides non-federal utilities with Intertie capacity on two bases: Formula Allocation and Assured Delivery.
 
 1. Formula Allocation
 
 10
 Formula Allocation is the policy which apportions Intertie capacity in excess of that required for firm power transactions. This policy allows non-federal utilities to make short-term spot sales of surplus power. The allocation system varies depending on which of three conditions exists. Condition 1 exists when there is a likelihood of spill[1] in the Northwest hydro system. Under Condition 1, BPA and each scheduling utility are allocated a pro rata share of the available Intertie capacity based on their declarations of surplus energy.[2] Whenever BPA is unable to make sales equal to its pro rata share, BPA takes larger allocations on subsequent days until it is able to sell its full pro rata market share.[3]
 
 
 11
 Condition 2 occurs when there is no likelihood of spill in the power system but BPA and the Northwest utilities have more than enough surplus nonfirm energy to fill the Intertie. Under Condition 2, BPA and each scheduling utility again receive a pro rata share of the available capacity based on their declared surplus. If BPA's sales drop below 75% of its allocation, BPA may take larger allocations on ensuing days until the difference is eliminated.
 
 
 12
 Finally, under Condition 3, which becomes operative only when BPA and the Northwest utilities lack sufficient surplus to fill the Intertie, extraregional utilities may gain access to the Intertie.
 
 
 13
 In response to the concerns of California utilities and to test the alternatives we proposed in CEC, BPA is conducting an 18-month experiment[4] that applies during Conditions 2 and 3. Under the experiment, BPA receives its allocation first and the remaining Intertie capacity is made available to Northwest utilities on a competitive basis.
 
 2. Assured Delivery
 
 14
 The Assured Delivery provisions of the LTIAP allocate transmission capacity to non-federal sellers on a continuous, long-term basis allowing these non-federal utilities to make firm power sales and power exchange transactions. The LTIAP provides 800 megawatts ("MW") of Assured Delivery to non-federal utilities--up to 444 MW for long-term firm export sales, an amount equal to the Northwest utilities' existing average firm surplus, and the remainder for exchange transactions.
 
 
 15
 By granting Assured Delivery to non-federal utilities, BPA precludes itself from using that capacity for its own sales, resulting in an estimated revenue loss to BPA of a discounted net present value of $200 million over the period 1989-2006.[5] BPA imposed "operational mitigation" requirements to help offset this loss. First, the LTIAP requires that, for southbound deliveries, each utility requesting service during Conditions 1 or 2 must deduct its Assured Delivery from its Formula Allocation. To the extent that its Assured Delivery exceeds its Formula Allocation, the utility must purchase the difference (a) from BPA or a Scheduling Utility with a formula allocation during Condition 1, or (b) during Condition 2 from BPA, unless BPA is not then "in the market," in which case from any other utility with an allocation. For northbound energy returns, Northwest utilities electing to use "cash-out" provisions will have their available Intertie capacity reduced by the amount of the cash-out.[6] This arrangement is intended to preserve the economy energy market for all Northwest utilities. Alternatively, mitigation may be negotiated on a case-by-case basis.
 
 3. Fish and Wildlife Protection
 
 16
 To effectuate BPA's responsibilities to protect fish and wildlife, the LTIAP provides that a utility obtaining power from or constructing a hydroelectric plant located in a designated Protected Area will lose a portion of its formula allocation equal to the amount of power so acquired. New hydroelectric projects constructed in protected areas will be denied access to the Intertie unless they demonstrate that they will benefit BPA's fish and wildlife efforts.
 
 
 17
 Several parties now raise various challenges to the LTIAP. The parties include petitioners California Energy Commission ("CEC"), Pacific Gas & Electric Company ("PG & E"), the California Public Utilities Commission ("CPUC"), the Southern California Utilities, and Direct Service Industrial Customers ("DSI"), and intervenors Western Public Agencies Group ("WPAG"), Puget Sound Power & Light Company ("PSP"), the Northwest Power Planning Council ("NPPC"), and the Public Generating Pool ("PGP").
 
 JURISDICTION
 
 18
 We have original jurisdiction to review final actions and decisions of the BPA taken pursuant to any of the BPA's four enabling statutes. 16 U.S.C. Sec. 839f(e)(5); LADWP, 759 F.2d at 685 n. 1. CPUC contends, however, that BPA's adoption of the LTIAP constitutes ratemaking and thus requires approval by the Federal Energy Regulatory Commission (FERC) before judicial review is available. See 16 U.S.C. Secs. 839e(i)(6) and 839e(k). We reject this contention.
 
 
 19
 CPUC first argues that the LTIAP, by allocating the capacity of the Intertie to BPA and Northwest utilities on the basis of fixed, proportionate shares, effectively eliminates competition and allows BPA to charge higher rates in its transactions with California. It asserts that this process constitutes ratemaking. In CEC we ruled that virtually identical provisions in the NTIAP did not constitute ratemaking.[7] CEC, 831 F.2d at 1471-74. That holding compels a similar conclusion here.
 
 
 20
 CPUC also argues that the LTIAP's mitigation provisions constitute ratemaking. These provisions were not part of the NTIAP. Therefore, we did not address this issue in CEC.[8] CPUC notes that the LTIAP allows utilities the option of negotiating mitigation measures on a case-by-case basis, LTIAP Sec. 4(d)(2), and that such measures could include establishing a rate. But if it does, that rate would be subject to the procedural requirements of Section 7(i) of the Northwest Power Act, 16 U.S.C. Sec. 839e(i). That fact does not turn the preceding negotiations into ratemaking. The LTIAP may have some ultimate effect on rates, but the mere fact that an agency action has an indirect effect on revenues does not mean that the action constitutes ratemaking. See CEC, 831 F.2d at 1473.STANDARD OF REVIEW
 
 
 21
 We must affirm BPA's action unless it is arbitrary, capricious, an abuse of discretion, or in excess of statutory authority. 16 U.S.C. Sec. 839f(e)(2); 5 U.S.C. Sec. 706; CEC, 831 F.2d at 1472. This standard of review is deferential and presumes the agency action to be valid. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Because BPA drafted the Northwest Power Act, its interpretation of the Act is to be given "great weight" and should be upheld if reasonable. Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., 467 U.S. 380, 389-90, 104 S.Ct. 2472, 2479-80, 81 L.Ed.2d 301 (1984) (ALCOA I); Aluminum Co. of America v. Bonneville Power Administration, 891 F.2d 748, 752 (9th Cir.1989) (ALCOA II). Nevertheless, we are required to reject the BPA's constructions of a statute that are inconsistent with the statutes or that frustrate the policy Congress sought to implement. Southern Cal. Edison Co. v. FERC, 770 F.2d 779, 782 (9th Cir.1985). While we may not substitute our judgment for that of the Administrator, our factual inquiry is to be " 'searching and careful.' " LADWP, 759 F.2d at 691 (quoting Citizens to Preserve Overton Park, 401 U.S. at 416, 91 S.Ct. at 824).
 
 
 22
 Petitioners suggest, however, that BPA should be afforded less deference here because it has an economic interest in obtaining a larger share of the economic benefits of the interregional transactions. In support, they cite National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1571 (D.C.Cir.), cert. denied, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987) ("if the agency itself were an interested party ... deference might lead a court to endorse self-serving views that an agency might offer...."). We disagree. As we will explain below, BPA did not draft the LTIAP to maximize its revenues. Moreover, we have rejected the argument that BPA is entitled to no deference in ratemaking decisions, even where it has an interest in the outcome. ALCOA II, 891 F.2d at 757 n. 12. There is no reason for a different result here.
 
 ANALYSIS
 
 23
 A. Justiciability of the Direct Service Industrial Customers' Claims
 
 1. Standing
 
 24
 The Direct Service Industrial Customers (DSI) and the Western Public Agencies Group (WPAG) argue that their rates under the LTIAP will be higher than allowed by statute. BPA responds that any harm to DSI and WPAG resulting from a future rate increase caused by the LTIAP is merely speculative and, having suffered no direct injury by BPA's adoption of the LTIAP, DSI and WPAG have no standing to challenge the policy. To have standing, petitioners must show 1) that the challenged action caused them injury in fact, 2) that the injury was within the zone of interests to be protected by the statutes that were allegedly violated, and 3) that the relief sought would cure the injury. ALCOA II, 891 F.2d at 752. DSI and WPAG satisfy these requirements.
 
 
 25
 Contrary to BPA's claim, DSI and WPAG do not suggest that they will be injured by a possible rate hike. Rather, they claim that their current rates under the LTIAP are higher than they would be if the LTIAP complied with the statutory requirement that BPA's customers be charged the lowest rate possible. 16 U.S.C. Sec. 838g. BPA has estimated that by providing Assured Delivery to non-federal utilities under the LTIAP it will bring in $764 million less over a 20-year period than it would if it adopted a policy whereby it exhausted its surplus before allowing non-federal utilities access to the Intertie (a "federal-first" policy). LTIAP Administrator's Decision (Ad.Dec.) at 170. This "cost" must be borne by either the total requirements ratepayers or the Treasury. DSI argues that since the Treasury is being repaid on time, the ratepayers are bearing the burden. "There is harm in paying rates that may be excessive...." ALCOA II at 753. Thus, DSI and WPAG have alleged an immediate economic injury. That the injury is to their members does not deprive the organizations of standing. See Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).
 
 
 26
 DSI and WPAG have alleged a violation of 16 U.S.C. Secs. 838g and 839e(a)(1), which direct BPA to establish rate policies encouraging "the lowest possible rates to consumers." As consumers of BPA power, DSI and WPAG are within the zone of interest protected by the statute.
 
 
 27
 Finally, the alleged injury could be remedied by our directing BPA to adopt an allocation policy which seizes more of the Intertie for potential federal spot market sales or imposes higher costs for non-federal use. Although we do not direct BPA to adopt such measures, the fact that this relief is sought and that we have the power to give it satisfies the third requirement for standing. DSI and WPAG have standing to challenge the LTIAP.
 
 2. Reviewability
 
 28
 BPA further argues that the statutory directive that BPA sell power at "the lowest possible rates ... consistent with sound business principles" is a matter committed to the Administrator's discretion and thus is not reviewable. Generally, final agency actions are reviewable. "[N]onreviewability [is] a narrow exception, the existence of which must be clearly demonstrated." City of Santa Clara v. Andrus, 572 F.2d 660, 666 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). A matter is committed to agency discretion by law only when the statutory terms are so broad that there is "no standard against which [the court can] measure the lawfulness of the agency action." Id. The test is not applied in the abstract, but is "whether 'in a given case' there is no law to be applied." Id. (quoting Strickland v. Morton, 519 F.2d 467, 470 (9th Cir.1975)) (emphasis in original).
 
 
 29
 BPA cites three cases for the proposition that there is no law for this court to apply in this action: City of Santa Clara v. Andrus, 572 F.2d 660 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978); Pacific Power and Light Co. v. Duncan, 499 F.Supp. 672 (D.Or.1980); and Montana Power Co. v. Edwards, 531 F.Supp. 8 (D.Or.1981). Each of these cases found that the standards there at issue did not provide applicable law. Nevertheless, the cases are not controlling here. City of Santa Clara does not apply here because it involved a different standard. The other cases involved the same standard, but in a different context. Both Pacific Power & Light and Montana Power Co. addressed the reviewability of the "lowest possible rates" provision of 16 U.S.C. Sec. 838g and found there was no law to apply to a challenge to BPA's rate design decision. Rate design is a method of allocating costs among BPA's customers. Thus, the court correctly decided that the "lowest possible rates" standard would provide no law for resolving a dispute among purchasers of federal power. In this case, however, the petitioners' claim is directed at the impact on BPA's energy customers of its decision to provide Intertie access to non-federal utilities for the purpose of permitting those utilities to sell non-federal firm energy. In other words, DSI and WPAG claim that the LTIAP causes BPA to waste federal energy and to recover the lost revenues through higher rates for the federal energy BPA sells to DSI, WPAG and others. Here, the "lowest possible rates" standard provides applicable law. Cf. ALCOA II at 761.
 
 B. DSI's Challenges to the LTIAP
 1. DSI's Statutory Claims
 
 30
 We turn now to the merits of DSI's and WPAG's claim that the LTIAP is inconsistent with BPA's governing statutes because it does not fully satisfy federal needs for Intertie capacity before providing access to non-federal utilities, it fails to maximize BPA returns and it fails to recover from Northwest utilities all the revenue BPA forgoes by allowing these utilities access to the Intertie. We reject these contentions.
 
 
 31
 "In allocating Intertie capacity among itself and other Northwest electricity producers, BPA is statutorily required to give itself preference. 16 U.S.C. Sec. 837e." LADWP, 759 F.2d at 687. BPA may make the federal Intertie available to non-federal utilities if: 1) its assistance is at the expense of those entities whose power is transmitted, 16 U.S.C. Sec. 839f(i)(1); 2) the transmissions are "not in conflict with [BPA's] other marketing obligations," 16 U.S.C. Sec. 839f(i)(1)(B); and 3) the transmission does not cause a "substantial interference with [BPA's] power marketing program." 16 U.S.C. Sec. 839f(i)(3). BPA's statutory marketing obligations include 1) collecting sufficient revenues on sales of federal power to recover its costs and repay the Treasury, while 2) fixing rates "with a view toward encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles." 16 U.S.C. Secs. 838g and 839e(a)(1).
 
 
 32
 In developing the LTIAP, BPA balanced three interests: the desires of the Northwest generators to sell or exchange power on a firm basis to California; the desires of BPA's total requirements customers for stable and favorable rates; and BPA's obligation to repay the U.S. Treasury. DSI and WPAG argue that only the duties to repay the Treasury and to charge consumers the lowest possible rates are statutorily mandated and that by considering the welfare of Northwest utilities, BPA elevated a non-statutory policy consideration to the level of BPA's statutory marketing obligations. DSI suggests this approach was error because BPA ignored the priorities Congress decreed.
 
 
 33
 Although DSI's and WPAG's interpretation of the statutes is plausible, that fact does not require us to overturn the LTIAP. "This court need not find that the BPA interpretation of the four statutes 'is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' We need only conclude that it is a reasonable interpretation." LADWP, 759 F.2d at 693 (quoting ALCOA I, 467 U.S. at 389, 104 S.Ct. at 2479). The statutes cited above afford BPA a measure of discretion which it has exercised reasonably.
 
 
 34
 First, BPA gives itself preference on the Intertie, though not in the manner DSI suggests it should. BPA reserves sufficient capacity to satisfy its firm sales. Moreover, with the true up mechanism, BPA ensures that it has access to the Intertie for its spot sale needs. Thus, the LTIAP gives BPA sufficient access to carry the energy it produces while recognizing that the Intertie was envisioned in part as a resource available to non-federal utilities.
 
 
 35
 Also, the statutes do not dictate that BPA always charge the lowest possible rates. 16 U.S.C. Sec. 838g directs that rates be set "with a view to encouraging ... the lowest possible rates to consumers...." The words "with a view to encouraging" do not constitute a statutory command that the prices charged to consumers always be the lowest possible. Moreover, nearly every action by BPA has some arguable impact on future rates. If the strict interpretation of the "lowest possible rates" standard advanced by DSI were accepted, the discretion that Congress vested in the Administrator would be eliminated.
 
 
 36
 In addition, the direction to charge the lowest possible rates is tempered by the addition of the clause "consistent with sound business principles." 16 U.S.C. Sec. 838g. The federal-first policy espoused by DSI would preclude some Northwest non-federal generating utilities from gaining access to the Intertie. This exclusion would force those utilities to sell their energy in the Northwest, displacing BPA power sales. BPA reasonably concluded that a federal-first policy is not consistent with sound business principles.
 
 
 37
 Finally, unlike DSI, we read Sec. 839f(i)(1)(B) to require a customer to compensate BPA only for the expense of the actual transmission, not for revenues BPA forgoes by not using the capacity itself. Consequently, BPA is not undercharging the Northwest utilities to transmit their power as DSI suggests.
 
 2. DSI's Procedural Claims
 
 38
 DSI further argues that BPA's adoption of the LTIAP was arbitrary and capricious in three ways: 1) BPA failed to explain why, when the LTIAP produced net benefits, the interests of BPA's customers and non-federal utilities could not be balanced to benefit the non-federal utilities without imposing additional costs on BPA's customers; 2) BPA did not explain its failure to require any compensation from transmitting utilities for forgone returns resulting from Formula Allocation; and 3) BPA based its determination of the amount of Assured Delivery it would provide and the amount of mitigation for Assured Delivery on inconsistent assumptions of Intertie capacity. Although BPA may not have addressed these specific questions directly, our review of the Administrative Decision reveals that BPA gave sufficient reasons for its decisions to satisfy the arbitrary and capricious standard.
 
 
 39
 BPA addressed the concerns of its total requirements customers directly, and adequately explained its reasons for not adopting the federal-first policy promoted by DSI. Ad.Dec. at 26-27. BPA reasonably concluded that the economic impacts of the non-federal Assured Delivery provisions, given mitigation requirements, were acceptable, id. at 92, while providing significant interregional benefits, id. at 18, 26, 91, as well as benefits to BPA, id. at 26-27. BPA also described how its distribution policy under Formula Allocation protected its ability to generate revenue and maintain low rates. Id. at 27. Moreover, BPA recognized its responsibility to avoid imposing on its Northwest customers the burden of revenues lost as a result of its policies and stated that if the revenue-protective measures adopted in the LTIAP proved unworkable, it would turn to a federal-first policy to maintain rate stability. Id. at 28.
 
 
 40
 Finally, DSI suggests that BPA assumed the availability of a third AC line in the Intertie in calculating the amount of mitigation for Assured Delivery but did not consider that increased capacity in determining the amount of Assured Delivery. Consequently, DSI claims, if the third line is not completed, the savings due to the mitigation provisions will be insufficient to cover BPA's forgone revenues. Although one of the studies upon which BPA relied did assume the availability of the third line, BPA also relied on a study by the Pacific Northwest Utilities Conference Committee (PNUCC) that did not assume the third line. Thus, BPA's decision was based upon estimates under the current Intertie capacity as well as under the proposed increased capacity of the Intertie in 1991.
 
 C. The Formula Allocation Provisions
 
 41
 The California petitioners argue that BPA abused its discretion by adopting the Formula Allocation provisions because they are "anticompetitive" and BPA's stated objectives could be achieved by more competitive alternatives. Before addressing these arguments, we note that, although the antitrust laws do not apply to BPA,[9] BPA must consider some federal antitrust policies when allocating Intertie capacity. CEC, 831 F.2d at 1475; see also Gulf States Utilities Co. v. FPC, 411 U.S. 747, 757-60, 93 S.Ct. 1870, 1877-79, 36 L.Ed.2d 635 (1973); City of Huntingburg v. FPC, 498 F.2d 778, 783 (D.C.Cir.1974); but cf. Pension Benefit Guaranty Corp v. LTV Corp., --- U.S. ----, ----, 110 S.Ct. 2668, 2674-78, 110 L.Ed.2d 579 (1990) (Pension Benefit Guaranty Corp. not required to take explicit account of policies of bankruptcy or labor laws when rendering decision under ERISA). Nevertheless, if this responsibility to consider antitrust policies conflicts with BPA's obligation to be fiscally self-supporting, the responsibility to the Treasury takes precedence. 831 F.2d at 1475. In other words, BPA may allocate Intertie capacity on a pro rata basis to satisfy the demands of its governing statutes.
 
 
 42
 The California petitioners first contend that BPA has failed even to consider its responsibility to promote antitrust policies. They are wrong. BPA has given adequate consideration to the effect of the LTIAP on competition in the interregional energy markets. The most extensive section of the Administrator's Decision discusses the issues and concerns raised by the California petitioners here. Ad.Dec. at 48-71. In addition, before releasing the final LTIAP, BPA commissioned the Sullivan Report to assess the effect of the proposed policy on competition. Now, BPA is conducting an experiment to observe the effects of allowing competition among non-federal utilities for access to the Intertie during Conditions 2 and 3.[10] Clearly, BPA did give the anticompetitive effect of its policy significant consideration. This conclusion does not end the inquiry, however. We must now address whether BPA's policy is reasonable.
 
 
 43
 Petitioners argue that Formula Allocation is not necessary to assure BPA's financial stability. Formula Allocation allows the Northwest non-federal sellers to charge more for their nonfirm energy than they could if they were competing with each other. BPA asserts that federal revenues would be adversely affected by competition among the non-federal sellers because lower energy prices paid to those sellers would result in 1) decreased purchases by some of those utilities of BPA's firm power, and 2) increased "residential exchange" payments by BPA to some of those utilities.[11] BPA has estimated these impacts at approximately $10 million a year in lost firm sales and $6 million a year in increased residential exchange costs under a worst-case scenario. Ad.Dec. at 50-51.
 
 
 44
 These estimated costs of allowing competition for access appear to be overstated. In arriving at the $10 million estimate for lost firm power sales, BPA neglected to consider that it may be able to sell the displaced power to California on the spot market. Moreover, a majority of BPA's alleged residential exchange losses were to come from assumed increases in subsidy payments caused by lower PG & E and PP & L prices. The fixed shares of the Intertie of these utilities, however, are not subject to the LTIAP. These utilities would suffer some losses from a general decline in prices, but those losses would be tempered by the fact that there is no competition for their shares of the Intertie. Nevertheless, although BPA's estimate is exaggerated, BPA could reasonably assume that a policy allocating nonfirm capacity on a competitive basis would have some negative impact on BPA's revenues.
 
 
 45
 BPA offers four other justifications for the pro rata allocations: 1) without the allocations, the ability of Northwest utilities to underbid BPA because of their statutory right to know BPA's prices would threaten lost BPA revenues and wasted federal energy; 2) the allocations provide BPA with a mechanism to enforce restrictions on new hydroelectric plants in Protected Areas; 3) the allocations maintain prices during a time when spill conditions would drive Northwest prices below the cost of providing spot market energy; and 4) Northwest utilities, particularly smaller ones, receive continued assurance of their ability to export power and avoid wasteful spill. Because we find the fourth justification adequate to support BPA's decision, we need not assess the validity of the first three.
 
 
 46
 BPA supports its fourth justification by arguing that the pro rata allocation scheme is necessary to preserve the export market for small non-federal utilities such as the PGP in order to avoid spill and protect its own revenues. BPA's consideration of these factors is not inconsistent with any congressional directive.[12] In fact, pro rata allocation is consistent with the statutory requirement that excess capacity be made available to non-federal utilities "on a fair and nondiscriminatory basis." 16 U.S.C. Sec. 838d. Therefore, it is within BPA's discretion to develop a policy to protect the access of small utilities to the Intertie. If access were available only on a competitive basis, the larger utilities would nearly always be in a position to underbid the small utilities. This denial of access would be devastating to these small utilities which would be faced with the prospect of having to spill during Condition 1. Their only alternative would be to use the power which would otherwise be spilled to displace power purchases from BPA. BPA could sell some of that displaced power on the spot market, but the rates it could charge for the spot sales would generally be lower than those for the contemplated firm sales and its revenues would suffer. As we have already pointed out, BPA may consider its revenues when formulating its access policy.[13]
 
 
 47
 Our task is not to determine whether the BPA policy is the best available, but whether BPA considered the proper factors and acted reasonably in light of its governing statutes. In developing the Formula Allocation provisions, BPA reasonably balanced the interests it is required to consider.[14]
 
 D. The Assured Delivery Provisions
 
 48
 The California petitioners and PSP challenge the Assured Delivery Provisions of the LTIAP, but on different grounds from those proposed by DSI and WPAG. These challenges take two forms: 1) that the Assured Delivery limitations are inconsistent with BPA's governing statutes; and 2) that the 800 MW limitation and mitigation provisions are arbitrary and capricious and not adequately supported in the Administrator's Decision.
 
 1. Compliance With the Governing Statutes
 
 49
 16 U.S.C. Sec. 837e requires that any Intertie capacity which is not required for the transmission of federal energy "shall be made available as a carrier for transmission of other electric energy." In addition, the Transmission Act requires BPA "to make available to all utilities on a fair and nondiscriminatory basis" excess capacity which is available in the transmission system. 16 U.S.C. Sec. 838d. The legislative history of Sec. 837e explains that
 
 
 50
 In determining the existence of capacity excess to the needs of the Government, Federal needs reasonably foreseeable may be included but the Secretary may not decline to enter into a wheeling agreement merely because he may have energy available for sale to serve the same load.
 
 
 51
 H.R.Rep. No. 590, 88th Cong., 2d Sess. (1963); 1964 U.S.Code Cong. & Ad.News at 3342, 3350. We interpret this statement to mean that
 
 
 52
 BPA is permitted ... to reserve sufficient Intertie capacity not only for its current needs but also for its "foreseeable" future needs, so long as the agency does not compete with other utilities on the mere speculation that it "may have energy available" sometime in the future to sell to the same customer.
 
 
 53
 LADWP, 759 F.2d at 692.
 
 
 54
 The LTIAP provides 800 MW of Intertie capacity--out of a total capacity of approximately 5200 MW owned by BPA--to Northwest utilities for Assured Delivery service. BPA has projected that it will have a maximum of approximately 2100 MW of firm power and exchange contracts with California. Petitioners argue, then, that 2100 MW is the maximum capacity BPA can foreseeably have available to sell to California, and therefore should be the maximum amount BPA can reserve on the Intertie. The remaining 3100 MW, they claim, should be available to non-federal utilities for firm transactions. This result is plausible under, but not compelled by, the statutes.
 
 
 55
 As long as the BPA is fair and nondiscriminatory, it has the discretion to allocate excess transmission capacity as it sees fit. LADWP, 759 F.2d at 693. There is no requirement in the governing statutes that BPA provide any access on a firm basis. In fact, in normal years, BPA's own surplus economy energy supply is sufficient to load the entire Intertie with federal energy 46% of the year. If BPA satisfied all of its needs before making capacity available to others, there would be no capacity available for year-round, non-federal, firm transactions. Thus, BPA could make all of the excess capacity on the Intertie available only on a non-firm basis or on a firm basis for only part of the year.[15] Instead, BPA has responded to the request of these non-federal utilities and provides capacity for some firm transactions.
 
 
 56
 Moreover, BPA is statutorily required to satisfy its own needs before providing access to other utilities and to furnish transmission only as long as it does not interfere with its power marketing program. 16 U.S.C. Sec. 839f(i)(3). BPA's power marketing program includes its responsibility to recover its costs and to repay the Treasury. As we said in LADWP :
 
 
 57
 [I]t is clear from the legislative history that Congress did not intend BPA to compete with other Northwest utilities for access to the Intertie. The theme of the [Preference] Act is that BPA, as owner and operator of the Intertie, should be allowed preference in transmission of its electricity over the Intertie as necessary to meet its statutory mandate of being self-financing.
 
 
 58
 LADWP, 759 F.2d at 692. By limiting Assured Delivery to 800 MW--the amount BPA concluded it could supply and still meet its repayment obligations--BPA complied with the mandate of Sec. 839f(i)(3). Although Sec. 837e and its legislative history lends itself to various interpretations, that of BPA is reasonable. We therefore defer to BPA's interpretation.
 
 
 59
 2. Whether the 800 MW Limit Is Arbitrary and Capricious
 
 
 60
 To establish that BPA acted arbitrarily and capriciously in setting the 800 MW limit on Assured Delivery, petitioners must demonstrate that BPA "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automotive Insurance Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Petitioners have failed to meet this standard. BPA offers three justifications for the 800 MW limit: revenue impacts; operational concerns; and environmental effects. The Administrator's Decision contains adequate support for these justifications.
 
 
 61
 a. Revenue Considerations
 
 
 62
 In setting the limit on Assured Delivery, BPA considered its need to sell its own economy energy, the potential economic effects of Assured Delivery, and the benefits to BPA of providing opportunities to Northwest utilities to sell their surplus power to the Southwest. BPA based its decision on its own public assessment of the revenue impact of its Assured Delivery proposal and on a study by the PNUCC. BPA's study indicated that providing Assured Delivery would cause it to lose economy energy sales in the Southwest and priority firm sales in the Northwest due to seasonal exchanges in the winter. BPA estimated its losses at $9 million each year through 2006 even with the mitigation requirements. PNUCC estimated the losses at $3 million to $24 million per year.[16] Despite these losses, BPA determined for reasons discussed previously that its Assured Delivery policy was superior to a federal-first policy.
 
 
 63
 Petitioners argue that increasing the limit on Assured Delivery would not threaten BPA's ability to market its surplus power, because BPA could force the firm suppliers to buy BPA's surplus power at BPA's prices and send it along the Intertie as part of the suppliers' firm contract sales. This argument fails to consider the impact on BPA's revenues of the market for non-federal surplus economy energy. Many Northwest utilities depend on economy energy exports during high water months for a significant portion of their revenues. If all excess capacity on the Intertie were filled under firm contracts, these utilities could not export their surplus economy energy. This inability would cause these utilities either to spill or to displace their normal purchases from BPA with their own surplus power, resulting in lost revenue to BPA from reduced sales and greater costs under the residential exchange program established by the Northwest Power Act. 16 U.S.C. Sec. 839c(c). Again, BPA is entitled to take into account its own revenue requirements when it allocates time on the Intertie. The 800 MW Assured Delivery limitation adequately balances the interests of the utilities in having Intertie capacity available for firm transactions and BPA's interest in minimizing its losses incurred in allowing firm transactions.[17]
 
 
 64
 b. Operational Considerations
 
 
 65
 In establishing the 800 MW limit on Assured Delivery, BPA considered the ability of Northwest utilities to generate firm surplus power, the limitations on power generation during the summer, and the stated needs of utilities in both regions for exchange transactions. First, BPA relied on an annual PNUCC report which observed that non-federal firm surplus in the Northwest has never exceeded 420 MW. Moreover, BPA expects regional firm surplus supplies to decline in the future due to increased demand in the Northwest. Thus, BPA's allocation of 444 MW for firm sales closely tracks available supply and is reasonable.
 
 
 66
 Furthermore, August is a high demand month in the Southwest, but a low water month in the Northwest and a time when some reservoirs retain water for recreational needs. The 800 MW limit was the BPA estimate of the amount of Northwest non-federal generation prudently available for export during August. In addition, BPA met with the utilities and concluded that there was no need for a near-term Assured Delivery greater than 800 MW.[18] There is a reasoned basis in operational considerations for the 800 MW limit.[19]
 
 
 67
 This rationale, however, although alluded to, is not explicit in the Administrator's Decision. The Supreme Court has stated that an agency must "articulate a satisfactory explanation for its action...." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, 103 S.Ct. at 2866. Nevertheless, the Court also said that it will " 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " Id. (quoting Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) ). We conclude that the rationale for the 800 MW limit can reasonably be discerned from the Administrator's Decision.
 
 
 68
 c. Environmental Impacts
 
 
 69
 Finally, there is support in the Administrator's Decision for BPA's concerns that Assured Delivery above 800 MW could harm the environment. See Ad. Dec. at 95, 99-100. Failing to limit exports of firm surplus power to an amount equal to the region's existing non-federal supply would enable and encourage Northwest utilities to increase their surplus supplies and marketing opportunities by developing new resources for export, which could adversely affect the Northwest environment. In addition, the Intertie Development and Use Environmental Impact Statement ("Use EIS") indicated that seasonal exchanges above 500 MW may also have a deleterious affect on the reservoir system of the Northwest. Id. at 99.
 
 
 70
 CEC suggests that the LTIAP can avoid environmental problems associated with exchanges by structuring the exchanges differently (e.g., avoiding drawdowns on Northwest reservoirs during August by requiring nighttime energy returns from the Southwest when necessary to moderate reservoir fluctuations) rather than simply putting a limit on exchanges. CEC claims that BPA failed to evaluate sufficiently this and other alternatives. "While an agency may not rely on unsupported conjecture to explain its decisions, neither is an agency forced to document copiously every collateral inference it draws from its experience with a regulated industry and its general economic views." Natural Resources Defense Council, Inc. v. Herrington, 768 F.2d 1355, 1424 (D.C.Cir.1985) (citations omitted). Here, BPA's projections are based upon the Intertie Development and Use EIS and upon its experience in the industry. Any prediction about the future impact of standards necessarily involves an informed attempt to resolve uncertainties. Id. BPA acknowledges that its conclusions are sensitive to changes in its assumptions and, accordingly, has been conservative in setting Assured Delivery limits. It has made a rational prediction in light of limited available evidence. Thus, BPA's environmental justifications for the 800 MW limit are not arbitrary or capricious.
 
 
 71
 E. The Fish and Wildlife Provisions of the LTIAP
 
 
 72
 Section 7 of the LTIAP allows BPA to reduce the Formula Allocation of a non-federal utility that owns or acquires the output from a hydroelectric project located in a "protected area." Petitioner Puget Sound Power challenges this provision on two grounds: 1) that BPA has no authority to limit access to the Intertie because of a perceived impact of generating facilities on fish and wildlife; and 2) that such restrictions are the sole province of FERC through its licensing procedures. These arguments are without merit.
 
 
 73
 In CEC, we recognized BPA's "statutory obligation under the [Northwest Power Act] to use its 'authorities ... to protect, mitigate, and enhance fish and wildlife' in the Columbia River basin. 16 U.S.C. Sec. 839b(h)(10)(A)." 831 F.2d at 1477. We also stated that the Northwest Power Act's "focus on preservation and conservation modifies BPA's preexisting directives...." Id. at 1478. Finally, we held that BPA had the authority to ban all new resources from the Intertie in order to protect fish and wildlife, at least until the long-term policy was developed. Thus, in CEC we determined that BPA has at least some authority to protect wildlife by imposing restrictions on Intertie access. We reserved ruling, however, on whether a wholesale ban on new generating sources would be reasonable in a long-term access policy. We do not face that question here. Unlike the interim policy, the LTIAP does not impose a wholesale ban on new generating facilities. It allows Intertie access to utilities acquiring energy from new projects outside protected areas. Although the CEC opinion addressed only the temporary NTIAP, nothing in the opinion suggests that BPA's authority to protect wildlife by restricting Intertie access should be reduced when a long-term policy is at issue. In fact, this authority would be meaningless if it did not apply to long-term access policies.
 
 
 74
 Puget Sound Power's related argument, that BPA is usurping FERC's authority, is similarly inconsistent with CEC. In upholding the NTIAP in CEC, we implicitly rejected the notion that exclusive authority to limit Intertie access in order to protect fish and wildlife is vested in FERC.
 
 Conclusion
 
 75
 In drafting the statutes at issue here, Congress painted in broad strokes, outlining general directives for allocating Intertie access while delegating substantial discretion to the Administrator to develop specific access policies in compliance with those directives. Some of the petitioners have argued that the LTIAP does not go far enough to achieve a particular statutory goal, while others claim it goes too far. In light of the Administrator's many responsibilities, it is relatively easy for petitioners to focus solely on isolated responsibilities and argue that the LTIAP fails to meet those responsibilities to the fullest extent possible. The task of the Administrator, however, was to consider and reconcile all of the responsibilities delegated to him by Congress. The LTIAP is not without flaws. Nevertheless, the Administrator has complied with statutory requirements while adequately balancing the varied interests of the petitioners. We conclude that BPA's actions and decisions in developing the LTIAP were not arbitrary and capricious and we affirm the LTIAP in its entirety.
 
 
 76
 AFFIRMED.
 
 
 
 *
 The Honorable William H. Orrick, Senior United States District Judge, for the Northern District of California, sitting by designation
 
 
 [1]
 "Spill" exists when Northwest dams are overflowing and hydroelectric energy must either be generated immediately for sale outside the Northwest or the water's electric generative potential will be wasted
 
 
 [2]
 Utilities are discouraged from overstating their surplus energy by a "take-or-pay" rule which requires the utilities to pay the cost of transmitting their stated surplus whether or not the entire amount of the stated surplus is actually transmitted
 
 
 [3]
 This ability to expand allocation to assure a pro rata share of the sales is known as the "true up." BPA must offer power to the Northwest before it can sell power to California. This allows competitors to learn BPA's price and enables them to undercut that price. Often, this situation prevents BPA from making sales. The true up attempts to reduce the amount of sales lost by BPA as a result of these circumstances
 
 
 [4]
 This experiment was to end in March 1990. Due to a lack of data, however, the Administrator has extended the experiment an additional 18 months, to conclude in September 1991
 
 
 [5]
 BPA could avoid this loss by forcing the firm supplier to purchase surplus BPA power at BPA's rates when capacity is not otherwise available and send it along the Intertie as part of the supplier's firm contract. For reasons that will be discussed below, BPA rejected this alternative
 
 
 [6]
 A "cash-out" provision in an exchange contract allows the Southwest utility to purchase, in effect, the energy at nonfirm prices in lieu of actually returning it to the Northwest utility
 
 
 [7]
 FERC also ruled that the NTIAP was not ratemaking subject to its approval. 33 FERC (CCH) p 61,235, at p. 61,486 (Dec. 12, 1985)
 
 
 [8]
 Though CEC is not controlling on the question of whether the mitigation provisions constitute ratemaking, its reasoning is instructive. As with the provisions of the NTIAP found not to constitute ratemaking, the mitigation provisions do not "impose any charge at all or define any formula for computing charges." CEC, 831 F.2d at 1472. They do not "give BPA authority to increase or decrease its own established charges for energy." Id. Nor are these measures "a statement describing rates and charges for service." Id. at 1473, (citing 18 C.F.R. Sec. 300.1(7); 10 C.F.R. Sec. 903.2(n) ). Moreover, these measures do not conflict with any existing rate schedule, Id. at 1473
 CPUC relies on Portland General Electric Co. v. Johnson, 754 F.2d 1475 (9th Cir.1985) in which the court found a mitigation formula to be a change in the availability provision of BPA's NF-2 rate schedule for economy energy. In CEC we distinguished Portland General stating:
 Unlike the action in [Portland General ], the BPA action challenged here does not conflict with the agency's existing rate schedules. The Access Policy is a formal statement of BPA's Intertie allocation policies. It does not make BPA energy available to purchasers at charges authorized for other purchasers or in any way attempt to avoid established rates.
 CEC, 831 F.2d at 1473. The same is true here.
 
 
 [9]
 LADWP, 759 F.2d at 693 n. 12
 
 
 [10]
 Although this experiment is further evidence of BPA's attention to concerns of competitiveness, it is not a permanent part of the LTIAP and we do not consider it in our review of the access policy
 
 
 [11]
 Under Section 5(c) of the Northwest Power Act, an electric utility in the Northwest may elect to sell power to BPA at the "average system cost of that utility's resources." 16 U.S.C. Sec. 839c(c)(1). BPA then sells the same amount of power back to the utility at BPA's lower wholesale rate. This enables the utility to sell power to its residential customers at the priority rate given to residential customers receiving BPA federal power. Surplus energy revenues are used as a credit in calculating the utility's "average system cost" under the program. Thus, when Northwest utilities make less money on sales to California, BPA's residential exchange payments increase
 
 
 [12]
 Congress has never disapproved a policy allocating Intertie access on a pro rata basis despite being aware that BPA contemplated such a policy even before the Intertie was constructed. During early congressional hearings on the Intertie, Secretary of Interior Udall said, "It would be in the national interest and the interest of the electric consumers of both regions that all electric utilities participate fully in using such interconnections." Hearings before the Subcomm. on Irrigation and Reclamation of the Senate Comm. on Interior and Insular Affairs, 87th Cong., 2d Sess. 4 (1962). At those same hearings, former BPA Administrator Paul J. Raver also spoke in favor of the Intertie saying:
 It is also essential that the rights of the Northwest region as a whole be preserved directly. Likewise, it is necessary that no single utility or group of utilities, whether federally, municipally, or stockholder owned, be permitted to use the tie line or lines for the transmission of Federal power in such a manner as to control the destiny of any other utility or group of utilities....
 ....
 This bill, in our opinion, will provide the regulatory guidelines needed to insure that any tie line or tie lines, regardless of ownership, will be operated with due consideration to the rights and responsibilities of all the utilities of the Northwest and will be in the national interest.
 Id. at 75. Later, a Department of Interior Report informed Congress that:
 BPA ha[d] assured the public and private utilities of its service area access over Bonneville's lines to California, Nevada, and Arizona markets proportionate to the respective surpluses of the various utilities.
 Department of Interior Report to the Appropriations Committees of the Congress of the United States, Recommending a Plan of Construction and Ownership of EHU Electric Interties Between the Pacific Northwest and Pacific Southwest 34 (Comm.Print 1964).
 Once construction of the Intertie was authorized, the Department of Interior presented copies of the Exportable Agreement--the original Intertie access policy--to Congress. The Exportable Agreement allocated the federal Intertie capacity on a pro rata basis. Congress never took any action to change this policy.
 In outlining this history we do not mean to suggest that Congress has approved Formula Allocation. This history does indicate, however, that Congress has not prohibited such a policy and that it is within BPA's discretion to adopt a pro rata allocation scheme.
 
 
 [13]
 BPA also justifies the pro rata allocation mechanism as a response to the monopsony power of California utilities over the southern portion of the Intertie. The parties dispute whether Formula Allocation may be upheld on this basis. Because evidence in the record of anticompetitive conduct among the California petitioners is inconclusive and resolution of this issue is not necessary for our decision, we decline to rule on the issue here
 
 
 [14]
 CEC also asserts that the Preference Act and the Transmission Act prohibit BPA from affording Northwest non-federal power priority over non-treaty Canadian power for access to Intertie transmission. We expressly rejected this argument in LADWP. 759 F.2d at 693-94
 
 
 [15]
 We recognize that utilities are able to use Intertie capacity more efficiently and profitably if allocated on a firm rather than a nonfirm basis. Nevertheless, this ability is but one of several factors BPA considers in formulating the access policy. As will be discussed below, the disadvantages of allocating more power on a firm basis outweigh the benefits of efficiency
 
 
 [16]
 CEC argues that BPA has not established that seasonal exchanges would reduce BPA revenues because neither BPA nor PNUCC accounted for the fact that if BPA failed to make sales of firm power in the winter, it could cover some of those losses by selling that energy on the spot market. These sales would increase BPA's pro rata share of the Intertie and its revenues from nonfirm energy sales in the winter. Consequently, CEC contends, both BPA's and PNUCC's estimates of revenue losses were substantially overstated. On the other hand, BPA noted that its estimate was based on assumptions which may change, causing greater losses. Moreover, after BPA grants contractual rights to Assured Delivery, it cannot retrieve that Intertie capacity to minimize the effects of changed conditions until the contract terminates. Under LTIAP Sec. 1.4, these contracts can last up to 20 years. Thus, BPA's conservatism in granting Assured Delivery is justified by its prudent reluctance to decrease greatly its flexibility to respond to the uncertainties of the future
 
 
 [17]
 CEC also questions BPA's authority to impose the mitigation requirements. 16 U.S.C. Sec. 832a(b) authorizes the Administrator to operate Bonneville project transmission lines "as he finds necessary, desirable, or appropriate" to transmit energy. This delegation of authority is broad, allowing the Administrator substantial discretion. This discretion is tempered only by the implied limitation that the Administrator's action not be inconsistent with other congressional decrees. The mitigation provisions offend no statute. Therefore, it was within the Administrator's authority to adopt these provisions
 
 
 [18]
 In its reply brief, CEC alleges that BPA ignored the fact that utilities had expressed a need for seasonal exchanges in excess of 800 MW. PG & E alone, for example, had one signed contract and two letters of intent for three seasonal exchanges with Northwest utilities that would require 650 MW of Assured Delivery. These exchanges were to begin within three years of the issuance of the LTIAP. CEC argues, therefore, that BPA knew that the 800 MW was inadequate
 BPA, however, has stated that the 800 MW limit is sufficient to meet non-federal Assured Delivery needs for the near future. The limit is not permanent. BPA has committed itself to reassess the limit when the third AC Intertie Project is energized or abandoned in 1993. LTIAP Sec. 4(c)(1). Thus, BPA can accommodate any increased future needs of PG & E or other utilities.
 
 
 [19]
 CEC also supports its contention that the limits on Assured Delivery are arbitrary by noting that a BPA staff witness stated that there was no analytic basis for the original 440 MW limit on exchanges, and that it was simply the product of subtracting 360 MW of firm power sales from a predetermined 800 MW limit. Then, when firm power sales in the final LTIAP were increased from 360 MW to 444 MW, the amount of additional Assured Delivery for exchanges automatically dropped to 356 MW, to preserve the 800 MW total. In response, BPA explained that the 800 MW limit was the operational estimate of the proper sum of exchanges and firm sales. Consequently, given that maximum, the amount of allowed exchanges varied as a function of the amount of allowed firm sales transactions. Thus, the allocation for exchanges was not arbitrary